EMMA L. PAUL, Respondent, v GEORGE W. HALEY, as Executor of ALEX HALEY, Deceased, et al., Appellants.

Second Department, October 19, 1992

**APPEARANCES OF COUNSEL**

*Satterlee, Stephens, Burke & Burke,* New York *(Robert M. Callagy, Daniel G. Gurfein* and *Gary S. Tolchinsky* of counsel), for Estate of Alex Haley and others, appellants.

*Coudert Brothers,* New York *(Michael J. Calvey, Paula R. Silberthau* and *Marc D. Ostrow* of counsel), for American Broadcasting Companies, Inc., appellant.

*James P. Malone,* Rockville Centre, for respondent.

**OPINION OF THE COURT**

EIBER, J.

In 1966, the late Alex Haley began a search to trace his family's history in Africa and America which culminated, 10 years later, in the publication of the Pulitzer Prize winning book *Roots: The Saga of an American Family* (hereinafter *Roots). Roots* tells the story of Haley's African ancestor Kunte Kinte, who was abducted from his Village in West Gambia at the age of 16 and sold into slavery, and chronicles the lives of six generations of Kunte Kinte's descendants as they make the transition from slavery to freedom in America. *Roots* was adapted into a widely popular television mini-series which aired in January 1977, attracting some 130 million viewers. A sequel, *Roots: The Next Generation,* which aired two years later, also drew large audiences. On this appeal, we are asked to determine whether the defendants, in preparing *Roots* for publication and broadcast, misappropriated novel ideas or material contained in an unpublished autobiography written by the plaintiff, Emma Lee Paul. For the reasons which follow, we find, as a matter of law, that no misappropriation of novel ideas occurred, and accordingly, that the Supreme Court erred in denying the defendants' motions for summary judgment.

## I

The plaintiff Emma Lee Paul was born in the small town of

Hastings, Florida, in 1930, the twelfth of 13 children. In May 1974 Mrs. Paul submitted an autobiographical manuscript entitled *The Bold Truth* to the defendant Doubleday Publishing Company (hereinafter Doubleday). Although Doubleday rejected Mrs. Paul's manuscript and returned it to her in December 1974, she repeatedly resubmitted it, explaining that she was drawn to Doubleday because she believed in her heart that the company would ultimately publish her book. When the manuscript was once again returned to Mrs. Paul on November 29, 1978, it was accompanied by a letter from Doubleday editor Pyke Johnson, Jr. indicating that the publisher did not "believe that this is a book that we could sell successfully". Mrs. Paul's autobiography was similarly rejected by several other publishers, including Random House, Pantheon Books, and Time Life Books. Mrs. Paul had obtained a copyright for *The Bold Truth* in 1976, even though she was ultimately unable to find a publisher for her work.

While both *Roots* and *The Bold Truth* focus on the lives of black Americans, *Roots* "covers a much broader canvas" *(Alexander v Haley,* 460 F Supp 40, 42), commencing its narrative with the birth of the author's ancestor Kunte Kinte in 1750, and tracing the lives of his American descendants over a 200-year period. In contrast, *The Bold Truth* is a highly personal account of its author's own experiences as a black woman and as a mother. In her autobiography, Mrs. Paul recounts the story of her life from her childhood as a minister's daughter in the deep South, to her relocation in Long Island where she raised her children and built a home. *The Bold Truth* centers on Emma Paul's struggle to support herself and her family as a migrant worker, a peddler, and an hourly laborer, and concludes by relating, with great pride, the educational achievements of her 10 children. Although Mrs. Paul acknowledges in *The Bold Truth* that she has read of "Jim Crow, hate, prejudice, KKK, and lynching", she writes that she has never personally witnessed such prejudice, and her primary emphasis is upon racial harmony. Thus, throughout her work she repeatedly stresses that many white people, including those in the rural South, treated members of her family and other black people with kindness.

The theme and focus of *Roots* is strikingly different. The story begins in the Village of Juffure in West Gambia, where a baby boy is born to Omoro and Binta Kinte. Celebrating the traditions of his African forebearers, Haley proceeds to vividly recreate the newborn child's naming ceremony, which is held

eight days after his birth. When the eighth day arrives, the villagers gather in the early morning before the hut of Omoro and Binta. Taking the baby into his arms, Omoro whispers into his ear the name he has chosen, for "Omoro's people felt that each human being should be the first to know who he [is]". That night, "under the moon and stars", Omoro completes the ceremony by lifting his son, who he has named Kunte, up into the air, and crying softly, "behold—the only thing greater than yourself".

Sixteen years later, Kunte Kinte is captured by 18th century slave traders, and taken to Maryland on a slave ship, *The Lord Ligonier.* The horrors endured by Kunte Kinte and his fellow Africans aboard the ship, and the suffering Kinte faces after he is sold to a Virginia planter and deprived of his freedom and dignity, are described in brutal detail in Haley's work. *Roots,* which has been described as an amalgam of fact and fiction *(Alexander v Haley, supra),* then recounts the history of the Haley family in America through the birth of Kunte Kinte's daughter Kizzy in 1790, to the author's own birth in Ithaca, New York, in 1921. While *Roots* is a history of Haley's family, it is also a history of racism and prejudice in America, and thus Haley's family members bear witness to the rise of the Ku Klux Klan in the South, race riots, and segregation. *Roots* closes with the author's expressed hope that "this story of our people can help to alleviate the legacies of the fact that preponderantly the histories have been written by the winners".

## II

The history of this litigation dates back to 1981, when the plaintiff Emma Lee Paul commenced a Federal action against, *inter alia,* Alex Haley, his publishers, Doubleday & Company, Inc. and Doubleday Publishing Company, Inc. (hereinafter collectively Doubleday), and American Broadcasting Companies, Inc. (hereinafter ABC) alleging that the defendants had copied and unfairly used her autobiographical manuscript in preparing *Roots* for publication and broadcast. In an amended complaint filed in the United States District Court for the Eastern District of New York on or about February 11, 1982, the plaintiff set forth three claims for relief. Two of the claims alleged copyright infringement based upon the publication and televised broadcast of *Roots,* while the remaining claim, grounded on New York tort law, charged Doubleday with

unfair competition based on its alleged disclosure of the plaintiff's manuscript to Haley's editors during the preparation of *Roots*. The plaintiff's amended complaint was accompanied by an exhibit listing 37 alleged similarities between *Roots* and *The Bold Truth*. These alleged similarities included the plaintiff's claim that a minor character in *Roots* named Emma was modeled after her because they share the same first name and because the character is described as a woman who often reads the Bible. In addition, the plaintiff pointed to what she perceived to be similarities in expression contained both in her autobiography and in *Roots,* including phrases such as "pecan-colored" skin, "a sea of white faces", and "mouth watering food".

The defendants subsequently moved for summary judgment dismissing the two copyright claims for lack of similarity between *The Bold Truth* and *Roots,* and the unfair competition claim for lack of pendent jurisdiction. The motion was referred to Federal Magistrate David F. Jordan, who reviewed both works, and issued a report recommending dismissal of the plaintiff's action in its entirety. In recommending dismissal of the two copyright infringement claims, Magistrate Jordan rejected the plaintiff's claim that the defendants had misappropriated her expression, noting that while "[a] few events common to the experience of blacks in the South appear in both books", these events occur in "very different contexts and in different words". Magistrate Jordan further recommended that the plaintiff's remaining claim, alleging unfair competition, be dismissed for lack of pendent jurisdiction. The Magistrate's recommendations were adopted by Judge George C. Pratt, and Judge Pratt's dismissal of the action by order entered January 5, 1983 was subsequently affirmed by the United States Court of Appeals for the Second Circuit *(Paul v Haley,* 742 F2d 1433).

One month later, the plaintiff commenced the instant action in the Nassau County Supreme Court, asserting claims based on essentially the same facts she had alleged in the Federal action. The plaintiff's amended complaint, served on or about February 22, 1984, set forth nine causes of action against the defendants, including unfair competition, fraud, breach of contract, breach of implied contract, and prima facie tort. As in the Federal action, the plaintiff's complaint was accompanied by a list of alleged similarities between *Roots* and her autobiographical manuscript. The list of similarities, drawn in large part from the Federal litigation, noted, *inter alia,* that

both *Roots* and *The Bold Truth* made references to sweet potatoes cured by being placed under a bank of straw, to blacks who marry Indians, to faith healing, to white infants being nursed by black women, and to blacks who could "pass for white".

The defendants promptly moved to dismiss the amended complaint, and the Supreme Court (McGinity, J.) granted their motion to the extent of dismissing seven of the nine claims. The court, however, denied the motion insofar as it sought dismissal of the first cause of action which alleged that novel ideas and material contained in the plaintiff's unpublished manuscript were unfairly used by Doubleday and Haley in editing *Roots* and the sixth cause of action, which alleged breach of an implied contract to compensate the plaintiff for the use of novel ideas and material utilized by ABC in the televised adaptations of *Roots*.

Following extensive discovery by all parties, by notice of motion dated June 9, 1989, the defendant ABC moved for summary judgment dismissing the breach of implied contract claim remaining against it. In a supporting affirmation, ABC's attorney Paula Silberthau outlined the history of the litigation, and contended that the remaining cause of action against her client should be dismissed because the similarities relied upon by the plaintiff in support of her claim demonstrated that there was in fact no substantial similarity between ABC's telecasts and the plaintiff's autobiography. Ms. Silberthau further contended that a comparison of the subject works demonstrated that ABC had not misappropriated any novel ideas from the plaintiff, and that her claims rested "at very most on the use of words, phrases or historic facts which could be expected in any work of this genre". Moreover, relying upon evidence obtained during the discovery process, including admissions made by the plaintiff at her deposition, Silberthau additionally argued that ABC had no access, either directly or indirectly, to the plaintiff's work prior to the filing of her Federal action. In support of its motion, ABC also relied extensively upon numerous exhibits, including a complete copy of the plaintiff's autobiography *The Bold Truth,* videotaped copies of each televised episode of *Roots* and its sequel, *Roots: The Next Generation,* responses to interrogatories and portions of deposition testimony, the plaintiff's amended complaint and its accompanying list of 153 claimed similarities, and an exhibit analyzing each of the similarities alleged by the plaintiff.

Three weeks later, the defendants Alex Haley and Doubleday also moved for summary judgment, contending that the plaintiff's manuscript lacked the novelty required to sustain a cause of action for unfair competition, the sole remaining claim against them. The defendants additionally argued that the plaintiff could not establish that either Haley or his Doubleday editor Lisa Drew had access to the plaintiff's manuscript while *Roots* was being prepared for publication, and that the ideas and themes in *Roots* were independently conceived before the plaintiff submitted her manuscript to Doubleday. In support of their motion, Doubleday and Haley relied upon an affirmation by counsel, an extensive memorandum of law, and various exhibits, including excerpts from *Roots,* responses to discovery demands, the amended complaint filed by the plaintiff in the Federal action, and decisions pertaining to dismissal of the Federal action. Significantly, the defendants also relied upon the verified answers to interrogatories submitted by Alex Haley, in which he denied that he had ever heard of the plaintiff Emma Lee Paul prior to the institution of litigation, and averred that he drew upon research, folklore, and his own observations of African and black American culture in creating *Roots.* Further, in support of the defendants' claim that *Roots* was created independently the defendants submitted a copy of the condensed version of the work which was published in *Reader's Digest* magazine during the same month that the plaintiff submitted her autobiographical manuscript to Doubleday. Also included as an exhibit were the verified answers to interrogatories submitted by Doubleday, in which the publisher denied that it had ever given Haley access to the plaintiff's manuscript, and noted that *The Bold Truth* "was reviewed only by the Doubleday employee assigned to review that manuscript, was shown to no one else, and, subsequent to said review, was returned to the author".

In opposition to the motions for summary judgment, the plaintiff chiefly relied upon a memorandum of law prepared by her attorney, newspaper accounts of a plagiarism suit commenced against Haley totally unrelated to the instant action, and a newly revised list of similarities between *Roots* and *The Bold Truth,* now purporting to cite to approximately 700 instances in which the plaintiff's novel ideas were misappropriated. The expanded list included numerous instances in which the two works shared words in common or used similar expressions, such as "gifted child", "Model T Ford Truck",

"walking miles and miles", "milking the cow", "feeding chickens", "pharoah's army drowned", "thou shalt not kill", and "Lincoln freed slaves". In addition, the plaintiff also asserted that *Roots* misappropriated the content of her autobiography by making reference to a child who was large for her age, and describing, *inter alia,* characters playing cards and dice for money, children lying down to take naps on a pallet, and a slave owner who invited members of his own family home for dinner.

On November 30, 1989, the Supreme Court (Christ, J.), denied the defendants' motions, finding that the "conclusory" affidavits submitted by counsel were insufficient to establish the defendants' entitlement to summary judgment because they were not based upon personal knowledge of the facts. In addition, the court reasoned that Doubleday's evidentiary showing was deficient because the publisher had failed to submit affidavits to demonstrate that employees who assisted in editing the *Roots* manuscript had no access to *The Bold Truth.* Furthermore, with respect to ABC's claims, the court observed that while the "defendant's moving papers assume that there first must have been a misappropriation * * * before it can be liable under an implied contract in law", in fact "it is immaterial whether the original possession of the ideas or material by the defendant [ABC] was rightful or wrongful".

On appeal from the Supreme Court's denial of summary judgment, the defendants continue to urge that the material allegedly misappropriated from the plaintiff's autobiographical manuscript was not novel or original, and that the plaintiff's claims, which are predicated on "idea theft", must in consequence be dismissed.

## III

One of the fundamental axioms of copyright law is that copyright protection for "original works of authorship" (17 USC § 102 [a]) extends "only to the expression of [an] idea— not the idea itself" *(Mazer v Stein,* 347 US 201, 217; *Reyher v Children's Tel. Workshop,* 533 F2d 87, 90, *cert denied* 429 US 980; *Giangrasso v CBS, Inc.,* 534 F Supp 472, 476). Thus, while a grant of copyright in a literary work "secures for its author a limited monopoly over the expression it contains" *(Hoehling v Universal City Studios,* 618 F2d 972, 974), there can be no copyright protection in the " ' "ideas" disclosed' " *(Reyher v*

*Children's Tel. Workshop, supra,* at 91). Explaining the rationale behind this principle in *Reyher v Children's Tel. Workshop (supra,* at 90) the United States Court of Appeals for the Second Circuit noted that the exclusion of ideas from the scope of copyright protection reflects an attempt "to reconcile two competing societal interests: rewarding an individual's ingenuity and effort while at the same time permitting the nation to benefit from further improvements or progress resulting from others' use of the same subject matter".

Although copyright protection does not extend to an author's ideas, New York law, in contrast, recognizes that an individual can have a protectable property interest in an idea which is novel and original *(Murray v National Broadcasting Co.,* 844 F2d 988, *cert denied* 488 US 955; *Kienzle v Capital Cities/Am. Broadcasting Co.,* 774 F Supp 432; *McGhan v Ebersol,* 608 F Supp 277, 284; *Galanis v Procter & Gamble Corp.,* 153 F Supp 34). As former Chief Judge Fuld explained in the leading case of *Downey v General Foods Corp.* (31 NY2d 56, 61): "An idea may be a property right. But, when one submits an idea to another, no promise to pay for its use may be implied, and no asserted agreement enforced, if the elements of novelty and originality are absent, since the property right in an idea is based upon these two elements". Ideas which are not novel are, therefore, not protectable as property, and cannot be misappropriated or stolen *(Murray v National Broadcasting Co., supra,* at 993). Accordingly, while ideas which reflect " 'genuine novelty and invention' " are fully protected against unauthorized use *(Murray v National Broadcasting Co., supra,* at 992, quoting *Educational Sales Programs v Dreyfus Corp.,* 65 Misc 2d 412, 416), ideas which are not novel "are in the public domain and may freely be used by anyone with impunity" *(Graham Prods. v National Broadcasting Co.,* 75 Misc 2d 334, 337). " 'Lack of novelty in an idea is fatal to *any* cause of action for its unlawful use' " *(Downey v General Foods Corp., supra,* at 61, quoting *Bram v Dannon Milk Prods.,* 33 AD2d 1010 [emphasis supplied]).

In the case at bar, both of the remaining claims against the defendants are based upon the alleged misappropriation of novel ideas contained in the plaintiff's copyrighted manuscript, *The Bold Truth.* The first of these claims, sounding in the tort of unfair competition, alleges that the plaintiff's periodic resubmission of her manuscript to Doubleday created a confidential relationship with the publisher, which Haley and Doubleday abused by unfairly utilizing novel ideas and

material drawn from *The Bold Truth* in preparing *Roots* for publication. The second claim, asserted against the defendant ABC, alleges that the television network unfairly utilized novel ideas and material contained in the plaintiff's work in adapting *Roots* for broadcast, and that the use of the plaintiff's materials and ideas created an implied contract in law to afford her compensation. Since the gravamen of both claims is "idea theft", in order to recover under either theory, the plaintiff must establish the existence of a genuine issue as to the novelty and originality of the allegedly misappropriated ideas *(see, Murray v National Broadcasting Co., supra; Granoff v Merrill Lynch & Co.,* 775 F Supp 621, 627, *affd* 962 F2d 2; *Women Golfer v Meredith Corp.,* 792 F Supp 211; *Ferber v Sterndent Corp.,* 51 NY2d 782).

Perhaps because the free exchange of ideas promotes contributions to recorded knowledge *(see generally, Hoehling v Universal City Studios,* 618 F2d 972, *supra),* courts have applied a stringent test in determining whether an idea is a truly innovative one which merits special protection. " '[N]ot every "good idea" is a legally protectible idea' ", and an "idea which is a variation on a basic theme will not support a finding of novelty" *(Ring v Estee Lauder, Inc.,* 702 F Supp 76, 78, *affd* 874 F2d 109). Thus, even though an idea need not reflect "the flash of genius" to warrant protection, it must "show genuine novelty and invention, and not a merely clever or useful adaptation of existing knowledge * * * Improvement of standard technique or quality, the judicious use of existing means, or the mixture of known ingredients in somewhat different proportions—all the variations on a basic theme—partake more of the nature of elaboration and renovation than of innovation" *(Educational Sales Programs v Dreyfus Corp.,* 65 Misc 2d 412, 416, *supra; see also, Murray v National Broadcasting Co.,* 844 F2d 988, 995, *supra; McGhan v Ebersol, supra; Surplus Equip. v Xerox Corp.,* 120 AD2d 582).

The question of whether an idea is sufficiently novel or original to merit protection under New York law is amenable to summary disposition *(see, Ring v Estee Lauder, Inc., supra),* and in opposing summary judgment, the plaintiff, who bears the burden of coming forward with proof of novelty, "cannot rest on mere assertions of novelty and originality", but must instead "demonstrate some basis in fact for those claims" *(Women Golfer v Meredith Corp., supra,* at 214; *see, Ferber v Sterndent Corp.,* 51 NY2d 782, *supra).* Case law is replete with instances in which plaintiffs alleging misappropriation of

novel ideas have failed to meet this burden. For example, in *McGhan v Ebersol* (608 F Supp 277, 287, *supra),* the plaintiff claimed that the defendant had misappropriated his idea for "Friday Night Videos", a music video show broadcast over the NBC television network on Friday nights. In awarding summary judgment to the television network, the court found that the plaintiff "has been unable to point to any specific component * * * that did not have its origin either in MTV or in the industry in general" *(supra,* at 287). Similarly, in *Murray v National Broadcasting Co. (supra),* the court concluded that the plaintiff's idea for a situation comedy, similar to *Father Knows Best* and *The Dick Van Dyke Show,* but which focused on a black family in non-stereotypical roles, was a mere adaptation of known facts, rather than a genuinely innovative concept. Accordingly, the court rejected the plaintiff's claim that NBC had misappropriated his idea in creating the hit television series, *The Bill Cosby Show.*

Before applying these principles to the instant case, we observe that while the plaintiff's complaint seeks relief for the misappropriation of confidentially disclosed novel ideas, an examination of her submissions reveals that, in essence, she seeks to relitigate her claim that the defendants committed copyright infringement by misappropriating her *expression* of those ideas. In this regard, we note that all of the claimed similarities in language previously relied upon by the plaintiff in her copyright infringement action have now been included in the various lists of similarities which she has prepared during the course of this litigation. Indeed, in opposing summary judgment, the plaintiff herself contended that the items allegedly misappropriated by the defendants were used to "flesh out" rather than to create *Roots.* However, since it is the copyright laws which protect the "flesh" rather than the "skeleton" of a creative work *(see, Brady v Orion TV Prods.,* 1990 Copyright L Dec [CCH] ¶ 26,523 [US Dist Ct, SD NY, Jan. 17, 1990, Wood, J.]; *Alexander v Haley,* 460 F Supp 40, 46, *supra),* the claimed similarities upon which the plaintiff relies which pertain merely to expression do not support her pending State law claims for "idea theft". Thus, to the extent that the plaintiff continues to base her claims upon the copying of her expression rather than the misappropriation of noncopyrightable ideas, her present claims are pre-empted by the Copyright Act of 1976 *(see,* 17 USC § 301; *Walker v Time Life Films,* 615 F Supp 430, 441, *affd* 784 F2d 44, *cert denied*

476 US 1159; *Aiken Designs v Baby Togs,* 701 F Supp 108, 111; *Galerie Furstenberg v Coffaro,* 697 F Supp 1282, 1291).

Assuming for purposes of argument, however, that the material allegedly misappropriated from the plaintiff's manuscript constituted "ideas" rather than expression, the plaintiff's claims must still fail because she has not demonstrated that her ideas were novel and original. Although the plaintiff contends that approximately 700 items were misappropriated from *The Bold Truth* and used to "flesh out the idea of *Roots*", an examination of these alleged instances of misappropriation demonstrates that the plaintiff's claims are based on nothing more than the fact that certain words and phrases appear in both works, albeit in totally different contexts. Included in the plaintiff's list of alleged similarities are such common words phrases, and metaphors as "potatoes", "tomatoes", "courthouse", "best of friends", "sea of faces", "city slicker", "walking miles and miles", "too good to be true", "milking the cow" and "feeding chickens". To the extent that these examples, or any of the other words or common phrases and metaphors included in the plaintiff's list of similarities can be considered "ideas", they are examples of "existing knowledge" and "known ingredients" and cannot be considered novel. While some of the items included on the list relate to the plaintiff's own experience, such as her description of her sister's complexion as "reddish pecan", which she contrasts to Haley's description of a character's complexion as "a pecan colored brown", it is readily apparent that such descriptive devices are not genuinely innovative or original. Moreover, references to historical fact such as "Lincoln freed slaves", or biblical allusions, such as "thou shalt not kill" and "pharoah's army drowned", are common literary devices which may be freely used *(see, Hoehling v Universal City Studios,* 618 F2d 972, *supra; Alexander v Haley, supra).* Accordingly, as the defendants urge, even if the similarities alleged by the plaintiff are viewed as "ideas", "they are not protectable precisely because they lack novelty and cannot be monopolized by any one writer".

Since the "ideas" which the plaintiff claims were copied from *The Bold Truth* were not novel, her causes of action for unfair competition and breach of implied contract must fail even if, as the Supreme Court found, the defendants' moving papers did not establish that Haley and his Doubleday editor had no access to the plaintiff's manuscript. We further note that, contrary to the Supreme Court's conclusion, the fact that

the defendants' supporting proof was placed before the court by way of attorneys' affidavits, annexing the plaintiff's manuscript, deposition testimony, and other proof, rather than affidavits, based on personal knowledge, does not defeat the defendants' right to summary judgment *(see, Olan v Farrell Lines,* 64 NY2d 1092; *Bahlkow v Greenberg,* — AD2d — [2d Dept, Aug. 10, 1992]; *Garcia v Mondragon,* 159 AD2d 481; *Marks v Elephant Walk,* 156 AD2d 432).

We further find, in any event, that even if the record demonstrated an issue of fact with respect to novelty, the defendants rebutted the plaintiff's claims with proof that *Roots* was independently conceived by Haley well before the plaintiff's manuscript was submitted to Doubleday. In States which recognize causes of action for the misappropriation of ideas, a defendant may rebut a prima facie case by showing that he or she independently created the allegedly misappropriated idea *(see, Kienzle v Capital Cities/Am. Broadcasting Co.,* 774 F Supp 432, 436, *supra; Downey v General Foods Corp.,* 31 NY2d 56, *supra).* Here, the defendants convincingly established the defense of independent creation by submitting portions of the plaintiff's own deposition testimony, which revealed that she sent her unsolicited manuscript to Doubleday in May 1974, the same month that the condensed version of *Roots* appeared in *Reader's Digest.* As the defendants urge, it is clear that the ideas, concepts, and themes in *Roots* would have had to have been conceived well before May 1974, in order for Haley to publish, that same month, a work articulating them. Accordingly, we find that the two works were independently created.

We have examined the plaintiff's remaining contentions, and find that they are without merit.

HARWOOD, J. P., LAWRENCE and BALLETTA, JJ., concur.

Ordered that the orders are reversed, on the law, the defendants' respective motions for summary judgment dismissing the complaint are granted, and the complaint is dismissed; and it is further,

Ordered that the appellants appearing separately and filing separate briefs are awarded one bill of costs.