Jamil BLACKMON,

v.

Allen IVERSON.

No. CIV.A. 01–CV–6429.

United States District Court, E.D. Pennsylvania.

April 4, 2003.

Frederick A. Tecce, Mcshea Tecce PC, Philadelphia, PA, for Plaintiff.

Joseph J. Serritella, Pepper, Hamilton & Scheetz, Kathleen A. Johnson, Pepper Hamilton, LLP, Phila., PA, Lawrence H. Woodward, Jr., Thomas B. Shuttleworth, Shuttleworth, Ruloff, Giordano & Swain, P.C., Virginia Beach, VA, for Defendant.

## MEMORANDUM AND ORDER

MCLAUGHLIN, District Judge.

The plaintiff, Jamil Blackmon, has sued the defendant, basketball player Allen Iverson, for idea misappropriation, breach of contract, and quantum meruit (unjust enrichment), all arising out of the defendant's use of "The Answer," both as a nickname and as a logo or slogan. The plaintiff, who describes himself as Mr. Iverson's "surrogate father," alleges that Mr. Blackmon came up with the idea that Mr. Iverson use "The Answer" as a nickname, and that Mr. Iverson promised that he would pay Mr. Blackmon twenty-five percent of the proceeds from the sale of merchandise using "The Answer."

Presently before the Court is the defendant's motion to dismiss. The Court will grant the motion.

### I. Background

The facts, according to the amended complaint are as follows [1] Mr. Blackmon met Mr. Iverson and his family in 1987. At that time, Mr. Iverson was a young high school student who showed tremendous promise as an athlete. Mr. Black-

---

**1.** The defendant brought his motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). In considering a motion to dismiss under Rule 12(b)(6), the Court "take[s] all well pleaded allegations as true, construe[s] the complaint in the light most favorable to the plaintiff, and determine[s] whether under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." *Colburn v. Upper Darby Township,* 838 F.2d 663, 665 (3d Cir.1988).

mon maintained a close personal friendship and relationship with Mr. Iverson and his family from 1987 forward. At various times in their friendship, Mr. Blackmon provided Mr. Iverson and his family with financial support, allowed Mr. Iverson and his family members to live in Mr. Blackmon's home, and provided other support to Mr. Iverson, such as picking him up from school and providing him with a tutor.

In July of 1994, Mr. Blackmon suggested that Mr. Iverson use "The Answer" as a nickname in the summer league basketball tournaments in which Mr. Iverson would be playing. Mr. Blackmon told Mr. Iverson that Mr. Iverson would be "The Answer" to all of the National Basketball Association's ("NBA's") woes. Mr. Blackmon and Mr. Iverson also discussed the fact that the nickname "The Answer" had immediate applications as a label, brand name, or other type of marketing slogan for use in connection with clothing, sports apparel, and sneakers. The parties also discussed using "The Answer" as a logo.

Later that evening, Mr. Iverson promised to give Mr. Blackmon twenty-five percent of all proceeds the merchandising of products sold in connection with the term "The Answer." The parties understood that in order to "effectuate Mr. Iverson's agreement to compensate" Mr. Blackmon, Mr. Iverson would have to be drafted by the NBA.

Mr. Blackmon thereafter began to invest significant time, money, and effort in the refinement of the concept of "The Answer." Mr. Blackmon continued to develop and refine the marketing strategy for the sale of merchandise, such as athletic wear and sneakers, in connection with the term "The Answer."

Mr. Blackmon retained a graphic designer to develop logos bearing "The Answer" as well as conceptual drawings for sleeveless t-shirts, adjustable hats, and letterman jackets for sale in connection with "The Answer."

In 1994 and 1995, during Mr. Iverson's freshman year at Georgetown University and the summer thereafter, there were numerous conversations between Mr. Blackmon and Mr. Iverson regarding Mr. Blackmon's progress in refining the marketing concept for "The Answer."

In 1996, just prior to the NBA draft, during which Mr. Iverson was drafted by the Philadelphia 76ers, Mr. Iverson advised Mr. Blackmon that Mr. Iverson intended to use the phrase "The Answer" in connection with a contract with Reebok for merchandising of athletic shoes and sports apparel. Mr. Iverson repeated his promise to pay Mr. Blackmon twenty-five percent of all proceeds from merchandising goods that incorporated "The Answer" slogan or logo.

On July 10, 1996, Mr. Iverson's lawyers wrote to Mr. Blackmon and stated that, despite the fact that Mr. Iverson and Mr. Blackmon reached an agreement regarding "The Answer," Mr. Iverson would not use "The Answer" because it was already a federally protected trademark.

Many months later, Reebok began manufacturing, marketing, and selling a line of athletic sportswear and sneakers using and incorporating "The Answer" slogan and logo. On numerous occasions thereafter, Mr. Iverson repeated his promise to pay Mr. Blackmon.

In the fall of 1997, Mr. Iverson told a third party that Mr. Blackmon had told him, "you need to call yourself 'The Answer,'" and had then explained to him the many marketing applications of "The Answer." During the week of Thanksgiving 1997, Mr. Iverson again promised to give Mr. Blackmon twenty-five percent of the "Reebok deal."

During the 1997–1998 NBA season, there were numerous conversations regarding Mr. Blackmon's marketing plan for merchandise, such as athletic wear and sneakers, sold in connection with "The Answer." Mr. Iverson also continued to repeat his promise to pay Mr. Blackmon.

Also during the 1997–1998 season, Mr. Iverson persuaded Mr. Blackmon to relocate to Philadelphia so that Mr. Blackmon could "begin seeking the profits from his ideas." Mr. Iverson also wanted to pay Mr. Blackmon back for the benefits the Iverson family had received when they had lived with Mr. Blackmon.

In the fall of 1998, Mr. Iverson advised Mr. Blackmon that Mr. Iverson had instructed his attorney to account for the number of "The Answer" units sold by Reebok and to distribute proceeds from those units to the plaintiff. At Thanksgiving of that year, Mr. Iverson told a third party that Mr. Blackmon was about to be a rich man, and that Mr. Blackmon could have twenty-five percent of Mr. Iverson's proceeds from the Reebok deal.

During the 1998–1999 NBA season, Mr. Blackmon again presented Mr. Iverson with logos incorporating "The Answer." Mr. Iverson advised Mr. Blackmon that Mr. Iverson intended to have Reebok incorporate the logo, that Mr. Iverson would give the logos to his lawyer, Lawrence Woodward, "Woody," and that Woody would present them to Reebok.

Thereafter, a meeting took place between Mr. Blackmon, Mr. Iverson, Mr. Woodward, and another individual. Mr. Blackmon told Mr. Woodward that Mr. Blackmon wanted to present him with some things Mr. Blackmon had produced for "The Answer" project. Mr. Blackmon then gave him with a package containing logos and graphics for jackets, t-shirts, and other items relating to "The Answer" project. Mr. Woodward agreed to discuss the matter with David Falk, Mr. Iverson's agent.

During the 1998–1999 and 1999–2000 NBA seasons, Mr. Iverson told Mr. Blackmon and a third party that Mr. Iverson was going to make sure that Mr. Blackmon got his due compensation from the Reebok proceeds. Mr. Iverson also told someone that he was happy that Mr. Blackmon would receive compensation from the exploitation of "The Answer" because he would not have to pay Mr. Blackmon directly from his basketball contract. Mr. Iverson stressed that the proceeds from "The Answer" were the vehicle for Mr. Blackmon's financial independence and restoration.

On or about November of 2000, Mr. Iverson was questioned as to why he had not talked to Mr. Blackmon about "The Answer" deal. Mr. Iverson stated that his attorney, Woody, had instructed him to cease all communications with Mr. Blackmon.

Reebok has continued to sell products bearing "The Answer" slogan and Mr. Iverson has continued to receive profits from the sale of products bearing "The Answer" slogan. Despite repeated requests and demands from Mr. Blackmon, Mr. Iverson has never compensated Mr. Blackmon and continues to deny Mr. Blackmon twenty-five percent of the proceeds from the merchandising of products incorporating "The Answer."

The plaintiff has not alleged that either Mr. Iverson or Reebok used any of the graphics or logos that he designed using "The Answer." At oral argument, the plaintiff conceded that his graphics were not incorporated into any of Reebok's products sold in connection with "The Answer." Transcript of September 5, 2003 Oral Argument (hereinafter "T.") at 62–64.

As damages for his misappropriation claim, the plaintiff requests all gains, profits, and advantages the defendant derived from the misappropriation. For the breach of contract claim, the plaintiff seeks compensation in an amount equal to twenty-five percent of the profits received by Mr. Iverson from the sale of goods using "The Answer." For the unjust enrichment claim, the plaintiff seeks compensation in an amount equal to the defendant's unjust enrichment.

## II. Analysis

The essence of all three of the plaintiff's claims is that the defendant took and used the plaintiff's ideas without compensating the plaintiff. This case raises the question of what legal protection is given to ideas—products of the mind.

Judicial decisions in this area of intellectual property attempt to "balanc[e] the rights of the creator of ideas or information to exploit them for commercial gain against the public's right to free access in these ideas." *United States Golf Ass'n v. St. Andrews Sys.,* 749 F.2d 1028, 1035 (3d Cir.1984).

The three established statutory systems for protecting intellectual property are copyright, patent, and trademark/deception as to origin. Courts have also been willing to give protection to ideas under various other legal theories: idea misappropriation; contract; quasi-contract or unjust enrichment; implied contracts; property theories; and confidential relationship theories. The plaintiff's claims fall into this latter category of protection.

### A. Idea Misappropriation

■ The elements of an idea misappropriation claim are that (1) the plaintiff had an idea that was novel and concrete, and (2) his idea was misappropriated by the defendant.[2] *Sorbee Int'l Ltd. v. Chubb Custom Ins. Co.,* 1999 Pa.Super. 178, 735 A.2d 712 (1999).

### 1. Was the Plaintiff's Idea Novel?

A threshold requirement for an idea misappropriation claim is that the plaintiff's idea be novel and concrete. The *Sorbee* court, taking guidance from *Thomas v. R.J. Reynolds Tobacco Co.,* 350 Pa. 262, 38 A.2d 61 (1944), held that novelty and concreteness are required so that the court could identify the idea as having been created by one party and stolen by another. *Sorbee,* 1999 Pa.Super. at 179, 735 A.2d 712. *See Thomas,* 350 Pa. at 263, 38 A.2d 61 (idea to use fact that Camel cigarettes are more economical because they burn more slowly not novel); *Sorbee,* 1999 Pa.Super. at 180, 735 A.2d 712 ("low calorie," "sugar free," "fat free," and "cholesterol free" not novel); *Vernick v. N.W. Ayer & Son Inc.,* No. 637, 1973 WL 19917, at *4 (Pa.Ct.Com.Pl. Jan. 15, 1973) (idea to use existing plastic ball to promote existing "Red Ball Service" not novel).

■ Denying recovery for the use of ideas that are not novel properly confines protection to those ideas that are truly valuable to society. *See generally* Reitenour, 18 Wm. Mitchell L.Rev. at 146. An idea is novel and merits protection when it is truly innovative, inventive, and new. *See, e.g., Paul v. Haley,* 183 A.D.2d 44, 53, 588 N.Y.S.2d 897 (1992) (novelty determined by whether an idea is "truly innovative" and merits special protection); *Desny*

---

**2.** *See generally* William Lockard, *You Have No Idea,* 23–APR L.A. Law. 32 (April 2000) (discussing the cause of action for idea misappropriation); Kim Radbell, *The Law of Idea Mis-* appropriation in New York: An Argument for Change, 5 Hofstra Prop. L.J. 427 (1993) (same).

*v. Wilder*, 46 Cal.2d at 742, 299 P.2d 257 (1956) (novel idea is unprecedented idea that has never before been conceived by anyone). An idea is not novel if it is merely a clever version or variation of already existing ideas. *E.g., Murray v. Nat'l Broadcasting Co.*, 844 F.2d 988 (2d Cir.1988) (idea for sitcom not novel because simply a variation of already existing ideas); *Downey v. General Foods Corp.*, 31 N.Y.2d 56, 334 N.Y.S.2d 874, 286 N.E.2d 257 (1972) (no novelty where plaintiff had come up with clever version of already existing marketing strategy).

■ The idea for which the plaintiff seeks compensation is that the defendant use the nickname "The Answer" as a professional basketball player in a marketing strategy scheme to sell various products, such as sneakers and sportswear. T., at 56–57. The use of a nickname by a professional sports figure is not novel; nor is the idea of selling products labeled with a nickname. The plaintiff concedes that these ideas are not novel but argues that the particular nickname he suggested was not in use so it is novel. *Id.*

The defendant argues that there is nothing innovative or novel in the words "The Answer," or using them as a nickname. The defendant contends that it is common for basketball players to use nicknames that consist of ordinary words with ordinary meanings.

It is doubtful that the suggestion of a nickname to a professional athlete could ever be novel; but, the Court need not decide this issue here because the complaint fails to allege other elements of idea misappropriation.

## 2. *Was the Plaintiff's Idea Misappropriated?*

The doctrine of idea misappropriation is derived from the seminal Supreme Court case of *Int'l News Svc. v. The Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918). The complainant in *Int'l News*, the AP newswire service, put time and effort into collecting information and transmitting this information to its subscribers, which were news publications. The defendant, a competing newswire service, took the information from the early editions of the news publications put out by the plaintiff's subscribers and transmitted the information to its own paying customers.

The Supreme Court held that, under federal common law, although any member of the general public had a right to use and retransmit the ideas contained in the publications, a competitor did not. *Id.* at 239, 39 S.Ct. 68. The Court found that equitable relief was warranted under an unfair competition theory; the defendant had acquired the information at little or no cost, used it to make a profit, and gained an unfair advantage over the complainant who was burdened with the expense of gathering the news. This amounted to an unauthorized interference with the complainant's business—a diversion of a portion of profits from the complainant. The Supreme Court held that the misappropriation of ideas was actionable as a subset of unfair competition.

Under the Supreme Court's reasoning in *Int'l News Svc.*, direct competition is an essential element of idea misappropriation. The Court of Appeals for the Third Circuit also held that under New Jersey law direct competition is required for idea misappropriation, absent a substantial justification for making an exception, because "it properly balances the competing concerns of providing incentives to producers of information while protecting free access." *United States Golf Ass'n*, 749 F.2d at

1039.[3] The Third Circuit reasoned that requiring direct competition "protects the public interest in free access to information except where protection of the creator's interest is required in order to assure that the information is produced." *Id.* at 1039, n. 17.

With this background, the Court examines Pennsylvania law to determine if Pennsylvania requires that the plaintiff and the defendant be direct competitors before a plaintiff may bring a claim for idea misappropriation.[4]

In *Sorbee Int'l Ltd. v. Chubb Custom Ins. Co.,* 1999 Pa.Super. 178, 735 A.2d 712 (1999), the Pennsylvania Superior Court, in the context of an insurance policy, explored the meaning of the term "misappropriation of advertising ideas." The Superior Court quoted with approval the three elements of a common law tort of misappropriation:

> (1) the plaintiff "has made a substantial investment of time, effort, and money into creating the thing misappropriated such that the court can characterize the 'thing' as a kind of property right," (2) the defendant "has appropriated the 'thing' at little or no cost, such that the court can characterize defendant's actions as 'reaping where it has not sown,'" and (3) the defendant "has injured the plaintiff by the misappropriation."

*Id.* at 182, 735 A.2d 712 (quoting *Lebas Fashion Imports of USA Inc. v. ITT Hartford Ins. Group,* 50 Cal.App.4th 548, 561, 59 Cal.Rptr.2d 36 (1996)).

The Superior Court then cited a Wisconsin case, again apparently with approval:

> *See also Atlantic Mutual Ins. Co. v. Badger Medical Supply Co.,* 191 Wis.2d 229, 528 N.W.2d 486 (1995) (essence of cause of action of misappropriation is the defendant's use of the plaintiff's product, into which plaintiff has put time, skill and money; and the defendant's use of the plaintiff's product or a copy of it in competition with the plaintiff and gaining an advantage in that competition because the plaintiff, and not the defendant, has expended the energy to produce it.)

*Sorbee,* 1999 Pa.Super. at 182, 735 A.2d 712.

These two definitions arguably are different. Under the first, the plaintiff may not have to be a competitor of the defendant; but, he must have been "injured" by the misappropriation. Under the second, the plaintiff and the defendant must be competitors, as was required by the Supreme Court in *Int'l News* and by the Third Circuit in *United States Golf Ass'n.*

■ The Court does not have to decide between the two definitions in *Sorbee* because under either definition, the plaintiff has failed to make out the element of misappropriation that requires that the plaintiff suffer a loss of competitive advantage or otherwise be injured in his business.

It is not alleged that either the defendant or Reebok is in direct competition with the plaintiff. The plaintiff has admitted that he wanted and intended for the defendant to use his idea. The plaintiff *does not allege* that he had any use for the idea himself or that he would have been able to sell it to anyone else. The plaintiff, therefore, has not alleged that he suffered

---

**3.** After the Supreme Court's decision in *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), misappropriation became a question of state rather than federal law. *United States Golf Ass'n,* 749 F.2d at 1036.

**4.** The parties agree that Pennsylvania law applies to the idea misappropriation claim.

any competitive or other financial loss when the defendant took his idea.

■ The plaintiff instead alleges that he suffered a loss when the defendant did not pay him for the use of the idea. This is insufficient. In order to state a claim for idea misappropriation, it must be the taking of the idea itself that causes the plaintiff a competitive or other financial harm. This occurs only when the defendant's use of the idea deprives the plaintiff of some competitive or financial benefit or causes some other detriment separate from the misappropriation. The loss must be independent of a defendant's failure to pay; to hold otherwise would render the third element of misappropriation superfluous. Because there is no allegation that the plaintiff was harmed competitively or financially by the misappropriation, the plaintiff has not properly pled misappropriation. *See also* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, 4th Ed., § 10:51 (direct competition is not required but there must always be some diversion of profits or other injury to the plaintiff's bottom line); David M. Nimmer, *Nimmer on Copyright*, § 16.01 (direct competition is not necessary in an idea misappropriation claim, but instead requires that there be a legal relationship between the parties, by express contract, quasi-contract, implied contract, or a fiduciary relationship).

The complaint also fails to allege the first two elements of a misappropriation claim: a substantial investment of time, effort, and money into creating an idea that the defendant has appropriated at little or no cost. The complaint does allege a substantial investment of time, effort, and money but not in the creation of anything the defendant appropriated. The plaintiff alleges that he spent time and money coming up with graphics and marketing ideas. Amended Complaint, at ¶ 29–31. There is no allegation, however, that the defendant or Reebok appropriated any of these graphics or marketing ideas. T., at 62–64.

### B. *Breach of Contract*

The plaintiff claims that he entered into an express contract with the defendant pursuant to which he was to receive twenty-five percent of the proceeds that the defendant received from marketing products with "The Answer" on them. The defendant argues that there was not a valid contract because the claim was not timely filed under the Pennsylvania statute of limitations, the terms of the contract were not sufficiently definite, and there was no consideration alleged.[5]

■ Under Pennsylvania law, a plaintiff must present clear and precise evidence of an agreement in which both parties manifested an intent to be bound, for which both parties gave consideration, and which

---

5. As a threshold matter, the parties disagree as to whether Virginia law or Pennsylvania law should apply to this claim. The plaintiff argues that Pennsylvania law applies; the defendant advocates the application of Virginia law. Because the Court finds that the claim should be dismissed for lack of consideration, a requirement in both Virginia and Pennsylvania, dismissal would occur regardless of which law is applied. Because there is, in essence, no real conflict, the Court need not decide the choice-of-law issue. *See Williams*

*v. Stone*, 109 F.3d 890, 893 (3d Cir.1997) (where there is a "false conflict" and law of both jurisdictions mandate the same answer, the court should avoid the choice-of-law question).

Because the Court has determined that the claim should be dismissed for failure to allege proper consideration, the Court need not address the defendant's other arguments about the statute of limitations and definiteness of terms.

contains sufficiently definite terms. *Lombardo v. Gasparini,* 385 Pa. 388, 393, 123 A.2d 663 (1956); *Biddle v. Johnsonbaugh,* 444 Pa.Super. 450, 664 A.2d 159 (1995); *see also R.K. Chevrolet v. Hayden,* 253 Va. 50, 480 S.E.2d 477 (1997) (consideration and definiteness in terms required for binding contract under Virginia law).

■■■ Consideration confers a benefit upon the promisor or causes a detriment to the promisee and must be an act, forbearance, or return promise bargained for and given in exchange for the original promise. *Eighth North–Val, Inc. v. William L. Parkinson DDS P.C. Pension Trust,* 2001 Pa.Super. 101, 107, 773 A.2d 1248 (2001); *Brewer v. Bank of Danville,* 202 Va. 807, 815, 120 S.E.2d 273 (1961). *See also Restatement of Contracts 2d,* § 71. Under Pennsylvania and Virginia law, past consideration is insufficient to support a subsequent promise. *See Sager v. Basham,* 241 Va. 227, 401 S.E.2d 676, 677 (1991); *Cardamone v. Univ. of Pittsburgh,* 253 Pa.Super. 65, 384 A.2d 1228 (1978).

It is difficult to analyze the alleged contract because the complaint describes various promises that were made by the defendant at various times. This problem with the plaintiff's alleged contract became even clearer at the hearing on the motion. Counsel for the plaintiff gave various dates for the formation of the alleged contract. T., at 80–95 (the "agreement and the discussions took place in early 1994;" "the last part of the contract didn't really take place until 1997;" "there was a meeting of the minds that took place in 1994, albeit the last ... part of that contract didn't really take place until after Mr. Iverson had gotten into the pros;" "there was an initial understanding in 1994 that is then modified for a more specific situation in 1996;" "in Philadelphia in 1997 there is a modification of the original understanding;" "the original contract could have been rescinded, it could have been modified by the parties;" and the contract "most importantly came into being in 1996"). On this basis alone, the complaint fails adequately to set forth the elements required for a contract claim.

The Court, nevertheless, will consider whether there was consideration at the various times the plaintiff alleges the formation of a contract.

The plaintiff has argued that, in exchange for the defendant's promise to pay the twenty-five percent, the plaintiff gave three things as consideration: (1) the plaintiff's idea to use "The Answer" as a nickname to sell athletic apparel;[6] (2) the plaintiff's assistance to and relationship with the defendant and his family; and (3) the plaintiff's move to Philadelphia. T., at 94, 97.

■■■ According to the facts alleged by the plaintiff, he made the suggestion that

---

**6.** Some courts, applying the contract theory to protect products of the mind, have required that an idea be novel and concrete in order to constitute consideration. *E.g., Masline v. New York,* 95 Conn. 702, 112 A. 639 (1921); *Soule v. Bon Ami Co.,* 201 A.D. 794, 195 N.Y.S. 574 (1922). *See also* David M. McGovern, *What is Your Pitch?: Idea Protection is Nothing but Curveballs,* 15 Loy. L.A. Ent. L.J. 475, 491–493 (1995). These courts reason that, if the idea is common and general to the whole world, the idea is not valuable and cannot qualify as consideration.

There are no Pennsylvania or Virginia cases on point. Some commentators reason that parties should be able to bargain for the disclosure of an idea on their own terms, regardless of the idea's status as property or how valuable the idea is to non-parties to the agreement. *See Nimmer* at § 16.08[A]. The Court will assume that under Pennsylvania and Virginia law, novelty and concreteness would not be required.

the defendant use "The Answer" as a nickname and for product merchandising one evening in 1994. This was before the defendant first promised to pay; according to the plaintiff, the promise to pay was made later that evening. The disclosure of the idea also occurred before the defendant told the plaintiff that he was going to use the idea in connection with the Reebok contract in 1996, and before the sales of goods bearing "The Answer" actually began in 1997.

Regardless of whether the contract was formed in 1994, 1996, or 1997, the disclosure of "The Answer" idea had already occurred and was, therefore, past consideration insufficient to create a binding contract.

The plaintiff also argued that the plaintiff's relationship with and assistance to the defendant and his family and the defendant's move to Philadelphia during the 1997–1998 season constituted consideration for the defendant's promise to pay. There is no allegation in the complaint that these actions by the plaintiff were in exchange for the defendant's promise to pay.

■ According to the complaint, the plaintiff's relationship and support for the defendant, his "surrogate father" role, began in 1987, seven years before the first alleged promise to pay was made. There is no allegation that the plaintiff began engaging in this conduct because of any promise by the defendant, or that the plaintiff continued his gratuitous conduct in 1994, 1996, or 1997 in exchange for the promise to pay. These actions are not valid consideration. *Greene v. Oliver. Realty*, 363 Pa.Super. 534, 546, 526 A.2d 1192 (1987) (promise is only binding if made in exchange for consideration); *Brewer*, 202 Va. at 815, 120 S.E.2d 273 (consideration is something given in exchange for the promise to pay).

■ The plaintiff also alleged at oral argument that his move to Philadelphia during the 1997–1998 season was consideration for the promise to pay. If the parties reached a mutual agreement in 1994, the plaintiff has not properly alleged that the move was consideration because there is no allegation that the parties anticipated that the plaintiff would move to Philadelphia three or four years later, or that the plaintiff promised to do so in exchange for the defendant's promise to pay.

Nor is there any allegation that the move was part of the terms of any contract created in 1996 or 1997. The complaint states only that the defendant "persuaded" him to move to Philadelphia to "begin seeking the profits from his ideas." Even when the complaint is construed broadly, there is no allegation that the move was required in exchange for any promise by the defendant to pay. In the absence of valid consideration, the plaintiff has no claim for breach of an express contract.

The plaintiff has not made a claim of promissory estoppel. At the hearing, the plaintiff confirmed that he was not making an argument based on detrimental reliance or promissory estoppel because he would only be entitled to reliance damages, an amount far less than what the plaintiff is seeking here. T., at 107.

If the plaintiff wishes to amend the complaint to state a claim of promissory estoppel, the Court will permit him to do so. The Court does note, however, that in order for the Court to have jurisdiction under 28 U.S.C. § 1332, the plaintiff's damages must exceed $75,000.00.

### C. *Unjust Enrichment*

■ The plaintiff has also brought a claim for unjust enrichment. Under Penn-

sylvania law,[7] the elements of a claim for unjust enrichment are "benefits conferred on defendant by plaintiff, appreciation of such benefits by the defendant, and the acceptance and retention of such benefits as it would be inequitable for the defendant to retain the benefit without payment of value." *Wiernik v. PHH U.S. Mortgage Corp.*, 736 A.2d 616, 622 (1999).

The alleged benefit in this case was the use of the plaintiff's idea. Several courts require that a plaintiff show that his idea was novel and concrete before the court will find unjust enrichment based on the use of that idea. *E.g., Hamilton Nat'l Bank v. Belt*, 210 F.2d 706 (D.C.Cir.1953); *Werlin v. Reader's Digest Ass'n*, 528 F.Supp. 451, 466 (S.D.N.Y.1981); *Galanis v. P & G Corp.*, 153 F.Supp. 34, 38 (S.D.N.Y.1957); *see also* McGovern, 15 Loy. L.A. Ent. L.J. at 488–89.

These courts reason that, absent novelty and concreteness, the plaintiff has not provided the defendant with anything that can be properly be deemed the property of the plaintiff; upon their release from the brain, non-novel and non-concrete ideas are common property. *E.g., Galanis v. Proctor & Gamble*, 153 F.Supp. 34, 37 (S.D.N.Y.1957). In the absence of novelty and concreteness, the plaintiff cannot show that he enriched the defendant; the defendant has only received an idea that he was already free to use. *E.g., Werlin v. Reader's Digest Ass'n*, 528 F.Supp. at 465–66.

■ Although the Pennsylvania Supreme Court has not opined on whether a claim of unjust enrichment based on the use of an idea requires novelty, it has required novelty in an implied contract case involving the use of an idea. *Thomas*, 350 Pa. at 266–67, 38 A.2d 61. The *Thomas* court reasoned that novelty was required for the creator to have a property

right in the idea used by the other party. *Id.* I hold that the Pennsylvania Supreme Court would reach the same conclusion in an unjust enrichment case.

■ As discussed above, it is very doubtful that the plaintiff's idea was novel. Even if the idea to use "The Answer" as a nickname were novel, the plaintiff would still not have made out a claim for unjust enrichment. The facts alleged in the complaint do not include an allegation that the plaintiff expected payment if the defendant used the nickname "The Answer." The plaintiff's facts show that he wanted and intended the defendant to use the nickname in summer league basketball tournaments, starting in 1994, without expecting any payment for that use. The plaintiff cannot make out a claim that the defendant was unjustly enriched by the use of a nickname that the plaintiff freely offered.

■ It is the use of the nickname on products for which the plaintiff claims damages. But the use of the nickname on products came years after the defendant began using the nickname. If the plaintiff concedes, as he does, that the idea of putting a nickname on products is not novel; and if the plaintiff is not claiming any damages for merely suggesting the use of the nickname to the defendant, and he is not, there is no unjust enrichment alleged in the complaint. Any benefit to the defendant from the marketing of products with "The Answer" on them comes from his fame as a basketball player and the investment in marketing the products by Reebok.

An appropriate order follows.

## ORDER

AND NOW, this 4th day of April, 2003, upon consideration of the defendant's Mo-

---

7. The parties agree that Pennsylvania law applies to this claim.

tion to Dismiss (Docket No. 13), the plaintiff's opposition thereto, and all supplemental filings by the parties, and following oral argument, IT IS HEREBY ORDERED that the motion is GRANTED and the plaintiff's first amended complaint is DISMISSED for the reasons set forth in a memorandum of today's date.

AND IT IS FURTHER ORDERED THAT, if the plaintiff wishes to amend his complaint to state a claim for promissory estoppel, he may do so on or before May 2, 2003.