Justice Dirk Sandefur delivered the Opinion of the Court.
***141 ¶1 Associated Management Services, Inc. (AMS) and Daniel R. Ruff and Ruff Software, Inc. (collectively Ruff) litigated numerous claims and counterclaims in the Montana Thirteenth Judicial District Court, Yellowstone County, over the parties' relative rights regarding the web-based payroll processing software, TimeTracker, developed by Ruff and licensed to AMS. Ultimately, the District Court granted summary judgment to Ruff, declaring the parties' 2008 licensing agreement valid and enforceable and effectively ruling that AMS had no right to TimeTracker other than as provided under the terms of the licensing agreement. Conversely, the court granted summary judgment to AMS on Ruff's counterclaims (breach of the licensing agreement, tortious interference with third-party relations, conversion, misappropriation of intellectual property, violation of the Montana Uniform Trade Secrets Act (MUTSA),[1] and unjust enrichment). Ruff appeals the District Court's judgments denying its second motion to compel discovery related to its counterclaims, granting summary judgment to AMS on those counterclaims, and denying Ruff's motion for attorney fees as the prevailing party on AMS's claims. AMS cross-appeals the court's judgments adjudicating the validity of the 2008 licensing agreement.[2] We affirm.
ISSUES
¶2 We address the following restated issues on appeal:
1. Did the District Court erroneously grant summary judgment in favor of Ruff that the 2008 TimeTracker licensing agreement was valid and enforceable and that AMS had no right to TimeTracker other than as provided by the agreement?
2. Did the District Court erroneously grant summary judgment in favor of AMS on Ruff's counterclaims?
3. Did the District Court abuse its discretion in denying Ruff's second motion to compel discovery?
4. Did the District Court abuse its discretion in denying Ruff's motion for attorney fees as the prevailing party on AMS's claims?
***142 BACKGROUND
¶3 AMS is a Montana business corporation engaged in the business of providing payroll and related business services to the members and affiliates of Associated Employers (AE). AE is a non-profit association of large regional employers and the parent company of AMS. From 1993-2011, Diane Ruff was the managing executive of AMS.[3] During Diane's tenure, AMS employed her son, Daniel R. Ruff, as a Support Services Specialist under one-year employment contracts. In pertinent part, Daniel's successive employment contracts expressly provided that all "materials prepared by Ruff as part of his employment with AMS," including all "files concerning Ruff's activities as Support Services Specialist," would "belong to and remain property of AMS." Inter alia , Daniel's contract-specified duties included "[m]anag[ing] or facilitat[ing] the information technology function for the AMS server and clients"; maintaining AMS's client-based payroll system; "understand[ing] and review[ing] payroll software and processes to determine and implement efficiencies";
*579 and "other responsibilities as assigned and required."
¶4 In 2006, in response to a client's interest, AMS offered to develop an Internet-based payroll time-tracking program with financial support from the interested client. When the client declined, Daniel proposed to Diane that AMS unilaterally develop the proposed software but Diane declined due to cost. Daniel then informally offered to develop the software at his own expense on the understanding that he would own the end product. Diane authorized him to proceed. At his own expense, Daniel retained the help of a former AMS consultant and proceeded with the project. Ultimately named TimeTracker, the finished product was a web-based program that allowed AMS clients to collect, maintain, and process payroll-related information and to integrate the client payroll information with other AMS-owned payroll software. Daniel installed and hosted TimeTracker on a Ruff-owned server located at AMS. Daniel spent over $20,000 of his own money in the development of TimeTracker.
¶5 In early 2007, as the development of TimeTracker progressed, Diane, acting in her capacity as the chief executive officer of AMS, e-mailed AMS counsel, Tim Filz, and instructed that "Dan needs to have an LLC set up for a web-based program he is developing." In accordance with Diane's instruction, Filz subsequently chartered Ruff ***143 Software, Inc., with Daniel as the sole principal. Aside from this initial informal agreement between Diane and Daniel, no other agreement existed between Ruff and AMS during the development of TimeTracker from 2007 into 2008. However, on June 1, 2008, in advance of AMS's online deployment of TimeTracker for client use, AMS (through Diane) and Ruff Software, Inc. (through Daniel) executed a written software licensing agreement, which was drafted by Filz pursuant to Diane's prior instruction and which:
(1) described TimeTracker as "certain software developed by Ruff" including "updates and future revisions ... regardless of the form ... or trade name under which the software is marketed";
(2) provided that "[a]ll such proprietary software programs and related material, with a proprietary notice in human- or machine-readable form, are proprietary and confidential";[4]
(3) authorized "AMS to use and ... sublicense the TimeTracker Software" exclusively to AE members;
(4) provided that "Ruff shall retain all rights" in TimeTracker "not granted herein" including the right to license TimeTracker to other parties;
(5) required AMS to pay Ruff 90% "of all fees collected from" AE members "for [the] use of" TimeTracker;
(6) provided that "[t]he term of this license shall be perpetual and shall survive the termination of Dan Ruff's employment with AMS," and that Ruff had the right to market TimeTracker directly to AE members in the event that AMS "quit promoting" it or "terminated its arrangements with" AE members; and
(7) included an express integration clause and provision for the prevailing party to recover reasonable attorney fees, costs, and other related expenses in the event of a breach of the agreement.
Pursuant to the agreement, AMS made TimeTracker available to its clients from the Ruff-owned server at AMS over Internet access provided by AMS. AMS maintained the Ruff server as required by the agreement but, at its discretion, did so through Daniel as part of his employment duties during his continuing tenure at AMS.
¶6 In simplified terms, TimeTracker, as installed on the Ruff server for use by AMS sublicensees, consisted of a functional component and ***144 a database component. Essentially the brain of the TimeTracker program, the functional component performed and produced desired end-user processing and output of end-user data, as inputted and stored in the database component. Daniel created the functional component through the use of Visual Basic Script (VBS), a standard alpha-numeric *580 computer programming language,[5] resulting in a complex set of coded alpha-numeric instructions constituting the source code for the functional component. Software developers generally do not include the alpha-numeric source code in or with an end-user program. Distinct from the alpha-numeric source code, the functional component of an installed end-user program generally consists of executable machine code. Machine code is a binary code set produced by processing the original alpha-numeric source code through a special computer program (compiler) which converts the source code into a binary code directly executable by computer processors (hardware).
¶7 Distinct from the functional component, the TimeTracker database component consisted of a relational database, which was composed of data structures (i.e. a table or sets of linked tables, with each table subdivided in matrix form into vertical columns (fields) and horizontal lines (records)) for structured storage of related information and, as referenced in this case, "stored procedures and triggers" that stored, retrieved, and processed data in and from the database as directed by the functional component. The "stored procedures and triggers" were essentially the programming interface between the functional component and the database data. Daniel created the TimeTracker data structures and associated "stored procedures and triggers" through the use of a Structured Query Language (SQL), a special alpha-numeric programming language used to create relational databases and provide the necessary interface operations between the functional component of a computer program and the database on which it operates. As installed on the Ruff server, the TimeTracker software consisted of the pre-compiled binary machine code constituting the functional component of the program and the uncompiled SQL source code (alpha-numeric code) constituting the TimeTracker database structures and associated database "procedures ***145 and triggers." Consequently, access to the installed and executable TimeTracker program on the Ruff server afforded access to the uncompiled alpha-numeric source code constituting the TimeTracker database component but not to the original source code for the functional component of the program.
¶8 Following execution of the 2008 license agreement, AMS began sublicensing TimeTracker for remote Internet use by its AE clients. Over the period of June 30, 2008, through December 15, 2015, AMS regularly paid Ruff 90% of the revenue generated on TimeTracker, totaling $83,641.73, in accordance with the licensing agreement. While the AMS board of directors apparently did not have formal notice of the licensing agreement until early 2013 when first referenced in management financial reports to the board after Diane left the company, AMS board meeting minutes manifest that its new executive director, Greg Roadifer, specifically raised concerns about the agreement to the board on April 23, 2013. The meeting minutes further indicate that the board directed Roadifer to "talk to Dan about AMS purchasing the TimeTracker system for a fair price and then Dan's wage could also be adjusted upward to reflect this."
¶9 After unfruitful discussions regarding the sale of TimeTracker in 2013, the issue returned to the fore in 2014 when Roadifer issued a memo criticizing Daniel for maintaining exclusive knowledge and control of the TimeTracker system, not acting professionally, and not being a "team player." The memo ultimately encouraged Daniel to leave the company to avoid "this awkward place you are in." In response, Daniel gave immediate notice of intent to leave AMS, which he did in September of 2014. In advance of leaving, Daniel provided AMS (through Roadifer) the credentials (user name and password) for administrative access to the Ruff server and TimeTracker. After leaving AMS, Daniel continued to provide consulting services to AMS to facilitate AMS's continued use and sublicensing of TimeTracker to AMS clients under the 2008 licensing agreement.
¶10 On March 26, 2015, six months after Daniel left the company, AMS (through Roadifer) e-mailed Ruff and again inquired if Ruff would "consider selling" TimeTracker to *581 AMS. Referencing AMS's intent to "develop a new small business [Human Resource Information System] for [its] Members," Roadifer explained that "we need to be able to modify, change, and adapt the TimeTracker program and system to work with our new HRIS web-based software." In conjunction with the anticipated purchase of AMS's own server and new router to host its current and future web-based software, Roadifer further advised that "[w]e would like to consider moving [the Ruff] server" to the new AMS ***146 router for "more flexibility and fail-safe protection." By e-mail response dated March 30, 2015, Daniel stated his plan to market TimeTracker "outside of AMS" unless AMS accepted his offer to buy "the website, source code, hardware, and everything that is TimeTracker" for $120,000.
¶11 On April 19, 2015, upon authorization of the AMS board, Roadifer e-mailed Daniel and, in reference to AMS's plan to "build" its own "HRIS system" and AMS's stated need to revise "the current TimeTracker ... to work with the new HRIS," counteroffered to buy TimeTracker and the Ruff server for $60,000. Roadifer explained that "[w]e would originally use the source code but would eventually transition away to a newer web technology with our new HRIS." On April 23, 2015, Ruff responded with its own counteroffer setting forth three different options under which AMS could either: (1) buy TimeTracker for $120,000 (as originally offered by Ruff); (2) buy TimeTracker for $60,000 (as originally counteroffered by AMS) plus $3,000 per month until AMS developed its own software with similar function; or (3) pay nothing, terminate the 2008 licensing agreement, and Ruff would then provide TimeTracker directly to AMS's clients. Ruff's April 23, 2015 e-mail further advised AMS that, "[r]egardless of the option chosen," Ruff would "no longer offer consulting services for the AMS payroll system effective June 1, 2015."
¶12 Without response to the Ruff counteroffer, and unknown to Ruff, AMS immediately made several unsuccessful attempts to access the Ruff server at AMS to copy the installed TimeTracker program for installation on an AMS-owned server for uninterrupted use by AMS's AE clients under the 2008 licensing agreement. With the assistance of a third-party computer consultant, AMS was ultimately able to access the Ruff server without Daniel's knowledge and copy the installed TimeTracker program for installation on the AMS server. On April 24, 2015, Roadifer e-mailed AMS's lead software developer, James Collins, and requested a meeting to discuss AMS's contemplated development of an AMS-owned replacement for TimeTracker. AMS separately e-mailed Collins the credentials (user name and password) for administrative access to TimeTracker as previously installed on the Ruff server.
¶13 In consultation with Roadifer and other AMS personnel, Collins subsequently developed AMS's own payroll software system known as SlatePay. Like TimeTracker, SlatePay consisted of a functional component, initially coded in a standard alpha-numeric computer programming language, and a database component, consisting of a database and related programming interface controlled by the ***147 functional component. However, unlike TimeTracker, AMS created the SlatePay database component (database and programming interface) through the use of NoSQL, a special alpha-numeric programming language used to create and interface with non-relational databases. Unlike the relational database used in TimeTracker, a NoSQL database stores data in a less-structured, non-tabular form. To the end-user, programs based on SQL and NoSQL databases can have similar appearance and function based on entirely different internal database architecture and structure.[6] With access to the uncompiled source code for TimeTracker's database component (TimeTracker's SQL-based database and "stored procedures and triggers"), Collins extracted AMS's client data from the TimeTracker database and converted it for input into SlatePay's NoSQL database.[7] *582 ¶14 Upon obtaining an installation copy of TimeTracker (functional and database components) from the Ruff server, re-installing TimeTracker on the AMS server, and embarking on development of the competing SlatePay program, AMS preemptively filed suit against Ruff in the Montana Thirteenth Judicial District Court. Based on its interpretation of Ruff's three-option counteroffer, AMS's original complaint alleged anticipatory breach of the 2008 licensing agreement by Ruff and sought declaratory judgment to preserve AMS's rights under the agreement. AMS alleged that Ruff planned to deny AMS access to TimeTracker and then market it directly to AMS's clients unless AMS paid a "stated sum." Consequently, AMS further requested preliminary and permanent injunctive relief enjoining Ruff from interfering with AMS's right to use TimeTracker under the 2008 agreement.
¶15 Following a record stipulation for dissolution of an ex parte temporary restraining order and unsuccessful mediation, Ruff filed an answer denying all of AMS's original complaint allegations and asserting various affirmative defenses and counterclaims, including breach of the 2008 licensing agreement, tortious interference with third-party relations, conversion, misappropriation of intellectual ***148 property, MUTSA violation, and unjust enrichment. Ruff's answer described TimeTracker as a "website [that] consists of several components," including compiled machine code (functional component) residing on the Ruff server at AMS together with SQL-based source code constituting the database component of the program. Ruff further sought declaratory judgment adjudicating the validity and enforceability of the 2008 licensing agreement and an injunction enjoining AMS from sharing or modifying the TimeTracker software, using TimeTracker in the development of AMS's own payroll-processing software, and requiring AMS to grant Ruff access to the Ruff server at the AMS facility. AMS subsequently filed an amended complaint asserting for the first time that AMS "owned" TimeTracker and that the 2008 licensing agreement was invalid as an unauthorized corporate act. In response, Ruff asserted additional counterclaims that AMS materially breached the licensing agreement and violated MUTSA by allowing unauthorized third-party access to the Ruff server to copy the installed TimeTracker software for use by AMS in developing its SlatePay software.
¶16 A central basis for Ruff's theft-based counterclaims (i.e. conversion, misappropriation of intellectual property, and MUTSA violation) and related discovery requests were two e-mails Daniel unexpectedly received in June 2015 from "slatepayroll.com" and addressed to him at "AE Widgets." Recognizing the name "AE Widgets" as part of a fictitious data set he created in 2007 for use in the development and testing of TimeTracker, Daniel first suspected that AMS was using TimeTracker to aid in the development of what became its competing SlatePay software. Based on that suspicion, Ruff subsequently propounded various discovery requests for production of specified documents including but not limited to all internal AMS e-mail communications regarding the development of SlatePay.
¶17 On October 2015, Ruff moved for summary judgment on the validity of the 2008 licensing agreement and AMS's claimed ownership of TimeTracker. Following the appearance of new counsel for AMS,[8] the District Court granted Ruff's motion, ruling that the 2008 licensing agreement was a valid and enforceable contract executed within the actual or ostensible authority of AMS's corporate agent, Diane Ruff, ***149 and in any event subsequently ratified by AMS board acknowledgment and performance. The court accordingly dismissed AMS's competing declaratory judgment claims, thereby effectively ruling that AMS had no right to TimeTracker other than as provided by the licensing agreement.
¶18 On March 22, 2016, in the wake of AMS's boilerplate responses to Ruff's requests *583 for production (e.g. not relevant, privileged, or not likely to lead to discovery of relevant evidence), Ruff filed a motion to compel more particular AMS responses related to the development of SlatePay including, inter alia , any and all internal AMS e-mails from April 2015 through June 2015 containing the words "TimeTracker," "SlatePay," or various iterations thereof. Ruff also moved for compelled production of SlatePay design and data-structure documentation, lists of SlatePay data field names, SlatePay source code, and any other technical information or related correspondence potentially probative of AMS's alleged use of TimeTracker code or features in the development of SlatePay. On June 1, 2016, the District Court partially granted Ruff's motion to compel, ordering production of a limited scope of internal AMS correspondence and e-mail communications, but held Ruff's request for production of the SlatePay source code in abeyance pending hearing.[9]
¶19 At hearing on June 13, 2016, Daniel conceded that, contrary to his earlier discovery requests, he did not need access to the SlatePay source code to assess whether AMS had converted or incorporated portions of TimeTracker into SlatePay. Moreover, AMS presented testimony from in-house software developer James Collins that, though he designed SlatePay to access the SQL-based TimeTracker database component to convert the stored AMS client data from the SQL format used by TimeTracker to the NoSQL format used by SlatePay, he had not otherwise examined or considered the TimeTracker source code in the development of SlatePay. Daniel testified that he was unable to rebut Collins's testimony because AMS had failed to provide the previously requested internal e-mails and because Ruff's retained expert was unavailable for the June 13th hearing. Based on Daniel's concession and Collins's unrebutted testimony, the District Court denied the balance of Ruff's motion to compel and allowed AMS to go forward with the development and marketing of SlatePay.
¶20 Following the June 13th hearing and prior to responding to AMS's ***150 pending motion for summary judgment on Ruff's counterclaims, Ruff moved for a continuance pursuant to M. R. Civ. P. 56(f) for additional time to: (1) obtain production of the AMS correspondence and internal e-mails compelled under the District Court's June 1st order; (2) depose Collins and other AMS personnel; and (3) allow Ruff's retained software expert to analyze the information obtained. The court granted Ruff's motion and ordered AMS to file a written certification of compliance with the June 1st order.
¶21 On August 24, 2016, Ruff filed a response to AMS's motion for partial summary judgment on the Ruff counterclaims. Two days later, in dispute of AMS's August 22nd certification of compliance with the June 1st discovery order, Ruff filed a second motion to compel additional production from AMS on the assertion that the "central issue at the heart of the litigation remains in dispute" due to AMS's failure to respond to previously propounded discovery requests, thereby preventing Ruff's expert from evaluating "whether and to what extent AMS leveraged TimeTracker in the creation of SlatePay." Ruff characterized AMS's response to the District Court's June 1st discovery order as a "2,000-page document dump" of "purportedly responsive materials" that "were largely irrelevant" and which "clearly omitted certain" previously requested documents such as internal AMS communications related to TimeTracker and the development of SlatePay between April and June 2015.
¶22 On September 26, 2016, the District Court conducted a hearing on Ruff's second motion to compel, the parties' cross-motions for summary judgment on Ruff's counterclaims, and a new Ruff motion for leave to assert additional counterclaims (bad faith and abuse of process). On October 12, 2016, with rulings on those matters still pending following the September 26th hearing, Ruff deposed AMS's lead software designer James Collins. Two days later, Ruff filed a supplement to its second motion to compel asserting that Collins' deposition testimony disclosed for the first time the existence and substance of previously requested, but yet unproduced, e-mails from AMS executive director Roadifer to Collins in 2015 regarding AMS's intent to develop what became SlatePay, *584 as well as a separate AMS e-mail transmittal to Collins of the credentials for administrative access to TimeTracker. Collins' deposition testimony further revealed that he had also exchanged a number of other previously requested, but as yet unproduced, e-mails with AMS information technology supervisor, Tracy Roadifer, about the development of SlatePay. Ruff further informed the District Court that Collins testified that he could easily create a previously requested list of SlatePay functions and features, ***151 user interfaces, and sample data.
¶23 On October 24, 2016, the District Court issued a written order denying Ruff's second motion to compel, denying its motion for leave to add additional counterclaims, and granting summary judgment on both parties' motions, thereby dismissing all remaining AMS claims against Ruff and all Ruff counterclaims against AMS. The District Court further ruled that neither party was entitled to attorney fees on the ground that neither had proven a breach of the 2008 licensing agreement by the other and thus neither was the prevailing party "[i]n the event of a breach" within the meaning of the contract attorney fees provision.
¶24 On November 7, 2016, Ruff filed a motion for contract attorney fees as the prevailing party in the dispute over the validity and enforceability of the 2008 licensing agreement or, alternatively, pursuant to § 27-8-313, MCA (discretionary attorney fees on successful declaratory judgment). Pursuant to M. R. Civ. P. 60(b), Ruff filed a separate motion requesting that the District Court set aside its grant of summary judgment to AMS on the Ruff counterclaims and related denial of Ruff's motion to add additional counterclaims. Ruff again asserted that Collins' deposition testimony revealed that AMS failed to produce previously requested internal AMS communications vital to his counterclaims. Ruff asserted that the Collins' deposition testimony confirmed Ruff's suspicions that AMS had accessed the TimeTracker database and converted its data for use in SlatePay. The District Court denied Ruff's Rule 60(b) motion on the ground that, in light of the existing facts of record, Collins' deposition testimony revealed no new information that was either relevant or reasonably likely to lead to the discovery of relevant information. The court further denied Ruff's motion for attorney fees. Ruff appeals and AMS cross-appeals.
STANDARDS OF REVIEW
¶25 This Court reviews a district court's grant or denial of summary judgment and related conclusions of law de novo for correctness. Bitterrooters for Planning, Inc. v. Mont. Dep't of Envtl. Quality , 2017 MT 222, ¶ 15, 388 Mont. 453, 401 P.3d 712 ; McClue v. Safeco Ins. Co. of Illinois , 2015 MT 222, ¶ 8, 380 Mont. 204, 354 P.3d 604. We review a district court's discretionary rulings on discovery matters for an abuse of discretion. Jacobsen v. Allstate Ins. Co ., 2009 MT 248, ¶ 53, 351 Mont. 464, 215 P.3d 649.
***152 DISCUSSION
¶26 1. Did the District Court erroneously grant summary judgment in favor of Ruff that the 2008 TimeTracker licensing agreement was valid and enforceable and that AMS had no right to TimeTracker other than as provided by the agreement?
¶27 The District Court granted summary judgment to Ruff that the 2008 licensing agreement was a valid and enforceable contract executed within the actual or ostensible authority of AMS's corporate agent Diane Ruff and subsequently ratified by AMS board acknowledgment and performance. The court accordingly dismissed AMS's competing declaratory judgment claims, thereby effectively ruling that AMS had no right to TimeTracker other than as provided by the licensing agreement. AMS asserts that the District Court erred because Daniel created TimeTracker within the scope of his AMS employment and that the agreement was thus void due to lack of consideration. AMS alternatively asserts that the agreement is voidable by the corporation as an unauthorized act of a corporate agent and legally not subject to subsequent ratification due to a conflict of interest.
a. Sufficiency of Consideration
¶28 Legal obligations arise by contract or operation of law. Section 28-1-102, MCA. The essential elements of a contract *585 consist of identifiable and capable parties, mutual assent, a lawful object, and "sufficient cause or consideration." Section 28-2-102, MCA. Legally sufficient contract consideration requires: (1) a benefit offered by a promisor to another, or a promisor's offer to suffer a detriment to the other; (2) offered by the promisor in exchange for or to induce a reciprocal benefit from or detriment suffered by the other; and (3) the offered exchange or inducement involves a benefit to which the other is not already "lawfully entitled" or a detriment that the promisor is not already "lawfully bound to suffer." Section 28-2-801, MCA. Absent affirmative proof to the contrary upon substantial evidence, a written contract is presumed to be supported by "good and sufficient consideration." Sections 26-1-602(38) and 28-2-804, MCA. A party seeking to invalidate a written contract has the burden of proving lack of sufficient consideration. Section 28-2-805, MCA ; Hodgkiss v. Northland Petroleum Consol. , 104 Mont. 328, 334, 67 P.2d 811, 814 (1937).
¶29 Here, Ruff made a threshold factual showing pursuant to M. R. Civ. P. 56 that, apart from his express employment contract duties, he and AMS, through its chief executive officer, orally agreed that Daniel would develop what became TimeTracker for commercial use by AMS on the understanding that Daniel would retain ultimate ownership of ***153 the software. Beyond genuine material dispute on the record presented, the rudimentary agreement benefitted AMS by allowing it to provide a beneficial service to the constituent membership of its parent organization, AE. The agreement reciprocally benefitted Daniel by allowing him to create and hold a contract interest in a commodity of value, albeit then unspecified. Though the threshold development agreement, as manifest on the evidentiary record, did not specify the parties' relative ownership and use rights, it was nonetheless a simple exchange of reciprocal promises regarding a lawful object of mutual benefit to both parties.
¶30 As development of TimeTracker neared completion, the parties built on the informal agreement to establish the more formal 2008 licensing agreement. Similar to the initial informal agreement, the licensing agreement manifestly allowed AMS to provide payroll services to members of AE. Regardless of other cost considerations not evident on the face of the agreement, the licensing agreement further expressly benefitted AMS by allowing it to retain 10% of the revenue generated from sublicensing the product for use by its clients. The licensing agreement expressly, clearly, and unequivocally identified the contract parties as AMS, acting by and through Diane Ruff in her capacity as AMS's "Executive Director," and Ruff Software, Inc., by and through Daniel as its "President/Owner."
¶31 AMS asserts that the apparent mutual consideration for the licensing agreement was nonetheless deficient or illusory because AMS already "owned" TimeTracker as the work-product of an employee, pursuant to §§ 39-2-403 and -409, MCA, the express terms of Daniel's 2007 and 2008 employment contracts, and the supplemental terms of the AMS employee handbook. A "benefit agreed to be conferred" or detriment "suffered or agreed to be suffered" by a promisor to the benefit of another is not valid contract consideration if the other is already "lawfully entitled" to receive the benefit or the consideration involves a detriment the promisor is already lawfully obligated to suffer. Section 28-2-801, MCA. Moreover, except for compensation due, "[e]verything that an employee acquires by virtue of employment ... belongs to the employer." Section 39-2-102, MCA ; see also §§ 39-2-403 and -409, MCA (general duty of employee to protect and prioritize the interest of the employer over the employee's own interest in a similar business).
¶32 Though we have not heretofore construed the interplay between §§ 39-2-102, -403, and -409, MCA, the employment relationship is primarily a contractual relationship. Section 39-2-101, MCA. The relative rights of the employer and employee are generally a matter of ***154 contract except as otherwise expressly provided by statute. Sections 28-1-102, 28-2-102, -602, -701, and 39-2-101, MCA ; Gentry v. Douglas Hereford Ranch, Inc. , 1998 MT 182, ¶ 38, 290 Mont. 126, 962 P.2d 1205 ; see also § 39-2-912(2), MCA (written contracts of employment not subject to Wrongful Discharge Act). While *586 §§ 39-2-403 and -409, MCA, generally impose a duty on an employee to protect and prioritize the employer's interest over any employee interest in a similar business, that general duty does not preclude, limit, or impair the right and ability of an employer and employee to separately contract regarding matters related to but outside the scope of the employment contract.
¶33 The construction or interpretation of a contract is a question of law. Krajacich v. Great Falls Clinic, LLP , 2012 MT 82, ¶ 13, 364 Mont. 455, 276 P.3d 922. Courts must give effect to the manifest intent of the parties as it existed at the time of contract formation. Krajacich , ¶ 13. If the language of a written agreement is clear and unambiguous, "the duty of the court is to apply the language as written." Estate of Pruyn v. Axmen Propane, Inc. , 2009 MT 448, ¶ 47, 354 Mont. 208, 223 P.3d 845. Here, Daniel's governing employment contracts expressly provided that all "materials prepared by Ruff as part of his employment with AMS," including all "files concerning Ruff's activities as Support Services Specialist ," would "belong to and remain property of AMS." (Emphasis added.)[10] Pursuant to the plain meaning of its clear and unequivocal language, this employment contract provision applied only to materials and files prepared by Daniel within the scope of his contract-defined employment as an AMS Support Services Specialist.
¶34 In pertinent part, Daniel's annual employment contracts specified that his employment duties included "[m]anag[ing] or facilitat[ing] the information technology function for the AMS server and clients"; maintaining the payroll system; "understand[ing] and review[ing] payroll software and processes to determine and implement efficiencies"; and "other responsibilities as assigned and required ." (Emphasis added.) Nothing in the plain meaning of the express language of the employment contracts evinces any provision or intent to include software development as part of Daniel's AMS employment duties or responsibilities. Though an apparent implicit term of Daniel's employment agreement with AMS, the general prohibition in the AMS employee handbook against personal use of company resources is ***155 insufficient to override an independently supported agreement between the parties specifically authorizing and providing for Daniel to develop TimeTracker to the parties' mutual benefit.
¶35 On the Rule 56 record, Ruff made a threshold factual showing that, apart from Daniel's express contract employment, he and AMS (through its chief executive officer) orally agreed that Daniel would develop what became the TimeTracker software at his own expense for use by AMS on the understanding that Ruff would retain a contract interest in the end-product. Further evidencing this threshold fact are the consistent terms of the 2008 licensing agreement, the fact of AMS's execution of the licensing agreement with a party (Ruff Software, Inc.) who was not an AMS employee, and AMS's consistent pre-dispute contract performance and payments to Ruff over a seven-year period. AMS's responsive reference to Daniel's express contract duties and the general prohibition in the AMS employment handbook of personal use of company resources are insufficient to raise a genuine issue of material fact to the contrary or to support AMS's related assertion that the 2008 licensing agreement was not supported by legally sufficient consideration.
b. Mutual Assent-Agency Principles
¶36 AMS nonetheless asserts that the 2008 licensing agreement is invalid or unenforceable due to lack of mutual assent on the ground that Diane Ruff executed the agreement in an agency capacity without authorization of AMS's board of directors. Agency is "the fiduciary relation which results from the manifestation of consent by one person to another" that the agent shall act on behalf of the principal subject to the principal's control and consent. Butler Mfg. Co. v. J & L Implement Co. , 167 Mont. 519, 523, 540 P.2d 962, 965 (1975). See also Restatement (Third) of Agency § 1.01 (2006) ; § 28-10-101, MCA (agent is one who represents another in dealings with third parties). Except as otherwise provided by statute, a *587 principal may authorize an agent to perform any act that the principal may lawfully perform. Section 28-10-105, MCA. A principal may create an agency relationship by prior authorization or subsequent ratification of the representative acts of another. Section 28-10-201, MCA.
¶37 An agent has the authority actually or ostensibly conferred upon the agent by the principal. Section 28-10-401, MCA. Actual authority is authority that a principal either "intentionally confers" upon the agent or intentionally or negligently "allows the agent to believe the agent possesses." Section 28-10-402, MCA. Ostensible authority is authority that a principal intentionally or negligently "allows a third person to believe the agent possesses." Section 28-10-403, MCA. A ***156 principal may confer actual or ostensible authority upon an agent by express authorization or circumstantial implication. Freeman v. Withers , 104 Mont. 166, 172, 65 P.2d 601, 603 (1937). An actual or ostensible agent has implied authority to "do everything necessary, proper, and usual in the ordinary course" of the principal's business "for effecting the purpose of the agency." Section 28-10-405(1), MCA. A disclosed principal is liable in contract to third parties for the representative acts of an agent within the scope of the actual or ostensible authority conferred on the agent by the principal. Restatement (Third) of Agency § 6.01 ; see also §§ 28-10-401 and -405, MCA. Accordingly, unless otherwise "specially restricted" by board directive or bylaw, "a general or managing officer or agent" of a corporation has actual or ostensible authority to "enter into any contract which is usual, proper, or necessary ... in the ordinary transaction of the company's business." Audit Servs., Inc. v. Elmo Rd. Corp. , 175 Mont. 533, 536, 575 P.2d 77, 79 (1978).
¶38 Here, it is beyond genuine material dispute on the Rule 56 record that, at all times pertinent, Diane Ruff was the chief executive officer of AMS with general authority to act on behalf of the corporation within the broad scope of AMS's ordinary course of business. AMS was engaged in the business of, inter alia , providing payroll recordkeeping and processing services to its clients, including but not limited to the acquisition of software necessary or helpful to that end. It is beyond genuine material dispute on the Rule 56 record that the 2008 licensing agreement and its subject matter were within the scope of the ordinary course of AMS's business.
¶39 AMS's corporate counsel drafted the licensing agreement for Diane Ruff's signature in the name of the corporation. AMS made no affirmative factual showing disputing Diane's authority to enter into the licensing agreement without prior authorization of the AMS board. AMS made no affirmative factual showing that Diane had any reason to believe that either the initial informal agreement or the subsequent licensing agreement was outside the scope of her authority as the chief executive officer of AMS. AMS further made no affirmative factual showing that Daniel had any non-speculative reason to believe that Diane was not authorized to enter into the development and licensing agreements or that Diane actively or intentionally concealed the existence and terms of the licensing agreement from the AMS board. The mere facts that Diane and Daniel were mother and son and that the AMS board was not formally or specifically aware of the licensing agreement until the new AMS executive director raised "concerns" about it in 2013 after Diane left the company are insufficient without ***157 more to raise a genuine issue of material fact as to whether Diane was acting outside the scope of her actual or ostensible authority when she executed the licensing agreement seven years earlier.[11] On the Rule 56 record presented, we hold that Ruff was *588 entitled to judgment that Diane executed the 2008 licensing agreement within the scope of her actual and ostensible authority as the chief executive officer of AMS.
¶40 The District Court alternatively ruled that, even if arguendo Diane had executed the licensing agreement outside the scope of her actual or ostensible authority, AMS nonetheless ratified the agreement after she left the company. A principal may create an agency relationship by subsequent ratification of the representative acts of another. Section 28-10-201, MCA. "A contract which is voidable solely for want of due consent may be ratified by a subsequent consent." Section 28-2-304, MCA. Ratification is the affirmative confirmation of a prior act. Erler v. Creative Fin. & Inv. , 2009 MT 36, ¶¶ 25-26, 349 Mont. 207, 203 P.3d 744. A principal with knowledge of the material facts may ratify a prior unauthorized act or transaction by express declaration or implicitly by acts, statements, or conduct which reasonably manifests an intent to affirm or be bound by the act. Erler , ¶¶ 25-26 ; Freeman , 104 Mont. at 172, 65 P.2d at 603. Thus, a principal may ratify an unauthorized act by "knowingly accepting or retaining the benefit of the act." Section 28-10-211, MCA.
¶41 Implicit ratification is "usually clearly shown" where the principal "voluntarily recognizes" the act as binding and "proceeds to perform the obligations which it imposes." Freeman , 104 Mont. at 172, 65 P.2d at 603. Though mere acquiescence is not necessarily conclusive of ratification, voluntarily performance or payment on a previously unauthorized contract by a principal with knowledge of the material facts is presumptive proof of ratification where the party who entered into the agreement was a previously established agent of the principal and the principal's subsequent performance or payment is inconsistent with any other intention. Freeman , 104 Mont. at 172, 65 P.2d at 603 ;
***158 Larson v. Marcy , 61 Mont. 1, 9, 201 P. 685, 687 (1921). Ratification rests, inter alia , upon the principle of equitable estoppel and "the duty of the principal to repudiate" an unauthorized act of an agent "within a reasonable time after discovery." Larson , 61 Mont. at 9, 201 P. at 687. See also Butler Mfg. Co. , 167 Mont. at 526, 540 P.2d at 966 (duty to repudiate or disavow unauthorized act of agent immediately upon discovery). Thus, a principal with knowledge who acquiesces and affirmatively performs or pays on a previously unauthorized but otherwise lawful and beneficial act of a previously established agent is equitably estopped from later asserting that the act was unauthorized ab initio .
¶42 Here, it is beyond genuine material dispute on the Rule 56 record that the AMS board was specifically aware of the 2008 licensing agreement at least as early as April 2013 when the new executive director raised concerns about it following Diane Ruff's retirement. It is similarly beyond genuine material dispute that, despite knowledge of the agreement and the mother-son relationship between Diane and Daniel, AMS continued to perform and pay on the contract for an additional two years until negotiations broke down on AMS's offer to buy-out the contract. The pre-dispute conduct of AMS between April 2013 and 2015 clearly evidences that AMS highly valued its continued use of TimeTracker and acquiesced to be bound under the terms of the 2008 licensing agreement. Even if Diane was not authorized to enter into the licensing agreement in the first instance, AMS's acquiescence and affirmative performance and payment on the contract from 2013 to 2015 is presumptive proof of manifest intent to ratify the agreement. Aside from self-serving argument, AMS made no affirmative factual showing to the contrary.
c. Alleged Corporate Conflict of Interest Transaction
¶43 In the absence of a sufficient responsive showing to preclude summary judgment on Ruff's actual and ostensible authority and ratification showings, AMS selectively cites §§ 35-1-461 and -463, MCA, for the proposition that the 2008 licensing agreement was void ab initio as a conflict of interest transaction as defined by § 35-1-461, MCA. Consequently, AMS asserts that, absent a majority vote of uninterested AMS directors, the agreement was void as a matter of law pursuant to § 35-1-463, MCA. AMS asserts that the conflict of interest "deprived" Diane Ruff of any "actual or ostensible authority" that she may otherwise *589 have had and that, as a matter of law, a transaction that is void ab initio is not subject to ratification.
¶44 Corporate directors have statutory fiduciary duties of reasonable care, good faith, and loyalty. Section 35-1-418, MCA. Corporate officers ***159 have similar fiduciary duties. Sections 35-1-442 and -443, MCA. However, the compliance oversight and remedies for violation of those duties is different for directors than officers. Corporate directors serve at the discretion and oversight of the shareholders. See §§ 35-1-424, -425, and -462(1), MCA (shareholder authority to remove directors, actions for judicial removal of directors, and derivative actions against corporation or board of directors to adjudicate or enforce rights of corporation as a whole). In contrast, corporate officers serve at the discretion and oversight of the board of directors. See §§ 35-1-416(2) and -444(2), MCA (board of directors' authority to direct and remove officers). The board of directors has plenary authority over corporate officers within the scope of the corporate bylaws, as determined by the board, see §§ 35-1-416, -441, -442, and -444, MCA. While wrongful acts of corporate officers may conceivably be subject to derivative action by the shareholders or corporation to the extent of the utility of that remedy, the Montana Business Corporations Act (MBCA) does not expressly define or address conflict of interest transactions involving corporate officers. See Title 35, chapter 4, MCA.
¶45 In contrast, the MBCA provides a remedy for redress of director conflict of interest transactions but the remedy is limited to derivative actions involving director conflict of interest transactions, as narrowly defined by § 35-1-461(2), MCA, and which fall outside of the statutory safe-harbor for transactions that are either "fair to the corporation" under the "circumstances at the time" regardless of disclosure or those disclosed by the director with knowledge and approved by a majority vote of uninterested directors (or a majority vote of all uninterested shares). Section 35-1-462, MCA. See also Warren v. Campbell Farming Corp. , 2011 MT 324, ¶ 11, 363 Mont. 190, 271 P.3d 36 ; Commission Comments to § 35-1-461, MCA.[12] Director conflict of interest transactions are corporate transactions in regard to which a director knows at the time of the transaction that the director or a related person is interested. Section 35-1-461(1), (2) and -462(1), MCA. See also Commission Comments to § 35-1-461, MCA. A derivative action is "a civil suit" asserted by one or more shareholders, or the board of directors, against the corporation or board to adjudicate or enforce a ***160 right of the corporation as a whole. See § 35-1-541, MCA. See also § 35-1-462(1), MCA ; S-W Co. v. John Wight, Inc ., 179 Mont. 392, 399, 587 P.2d 348, 352 (1978).
¶46 As a threshold matter of law, §§ 35-1-461 and -463, MCA (narrow definition of director conflict of interest transactions and safe-harbor from derivative action attacks), apply only to director conflict of interest transactions within the scope of § 35-1-462, MCA, and when a director conflict is at issue in a derivative action asserted by shareholders against the corporation or board, or by the board against the corporation. See §§ 35-1-461, -462, -463, and -541, MCA. Here, regardless of whether Diane Ruff was an AMS board member or officer at the time of execution of the 2008 licensing agreement, and despite the fact that she and Daniel were related, this action is not a derivative action as defined by § 35-1-541, MCA. Rather, this action involves claims and counterclaims by and between a corporation and a third party (Ruff) who, on this record, was neither an AMS shareholder or director. Thus, as a threshold matter of law, §§ 35-1-461 and -463, MCA, have no application here.
¶47 Moreover, even if §§ 35-1-461 and -463, MCA, were applicable here, an undisclosed director conflict of interest transaction is neither void ab initio per se, nor voidable at the discretion of the corporation. See Commission Comments to § 35-1-461, MCA (discussing MBCA departure from prior statutory scheme). Rather, undisclosed director conflict of interest transactions are *590 merely subject to damages and injunctive relief, in a derivative action, upon proof that the transaction was unfair to the corporation under the totality of the circumstances. See 35-1-462(2)(c), MCA. Apart from the threshold fact that this is not a derivative action, AMS has further made no claim or showing of entitlement to damages or injunctive relief against Ruff.[13] We hold that the District Court correctly granted Ruff summary judgment that the 2008 licensing agreement was valid and enforceable in accordance with its express terms, thereby effectively ruling that AMS had no right to TimeTracker other than as provided under the terms of the agreement.
¶48 2. Did the District Court erroneously grant summary judgment in ***161 favor of AMS on Ruff's counterclaims?
¶49 On the asserted ground that genuine issues of material fact precluded summary judgment, Ruff asserts that the District Court erroneously granted summary judgment to AMS on the Ruff counterclaims for breach of contract, tortious interference with third-party relations, conversion, misappropriation of intellectual property, MUTSA violation, and unjust enrichment. On appeal, Ruff asserts that the following facts and assertions were sufficient to raise a genuine issue of material fact precluding summary judgment: (1) AMS "lied to Ruff by saying it would consult the [AMS] board about" Ruff's counteroffers in the TimeTracker purchase negotiations; (2) AMS "immediately contacted its lead software developer" after purchase negotiations stalled "to begin work on a [TimeTracker] replacement"; (3) AMS hired a third-party consultant to access the Ruff server and copy TimeTracker for installation on the AMS server; (4) AMS preemptively "[f]iled a lawsuit against Ruff and obtained a temporary restraining order" to "shield its 'use' of TimeTracker from scrutiny"; (5) AMS "[a]ttempted to use the lawsuit, TRO, and Ruff's former lawyers to coerce the sale of TimeTracker;" (6) AMS provided "lead software developer instructions on how to access TimeTracker"; (7) AMS used personnel with TimeTracker experience to assist in the development of SlatePay; and (8) "[a]t the very least," AMS "linked TimeTracker's database to SlatePay via an SQL adapter."
a. Ruff's Breach of Contract Counterclaim
¶50 The primary essence of Ruff's breach of contract claim is that AMS breached the 2008 licensing agreement by copying TimeTracker from the Ruff server, reinstalling and using the software on the AMS server, excluding Ruff from administering AMS's continued use of TimeTracker, and denying Daniel access to the Ruff-owned server at AMS after negotiations broke-down. Ruff asserts that AMS further breached the agreement, and violated MUTSA, by allowing a retained third-party consultant to access the Ruff server to make a backup copy of TimeTracker.
¶51 The construction or interpretation of a contract is a question of law. Krajacich , ¶ 13. If the language of a written agreement is clear and unambiguous, the court must apply the language as written. Estate of Pruyn , ¶ 47. The 2008 licensing agreement expressly authorized AMS to perpetually "use" and "sublicense" TimeTracker for use by its AE clients. In return, the agreement required AMS only to make specified contract payments, bill AMS's clients for TimeTracker use, maintain "the web server hosting TimeTracker onsite" at AMS, and provide "broadband access to AMS users." As recognized by the ***162 District Court, the agreement did not require AMS to host TimeTracker on Ruff's server-only to host it on an onsite web server maintained by AMS. The agreement similarly did not require AMS to maintain and administer TimeTracker exclusively through Daniel, whether in his employment capacity or in his capacity as Ruff's principal.[14] The agreement further expressly contemplated *591 that AMS's perpetual right to use TimeTracker would survive Daniel's eventual departure from AMS's employ. In the manifest absence of an express prohibition or limitation, the agreement's express authorization for perpetual onsite use and maintenance by necessity implicitly authorized AMS to copy the installed version of TimeTracker for reinstallation and use on another onsite server.
¶52 Ruff made no responsive showing that AMS interfered with Ruff's ownership of the Ruff server apart from acting to protect AMS's contract right to continued use of TimeTracker. Daniel admitted that AMS, not Ruff, owned the user or customer data maintained in the TimeTracker database and that he had no authorization to access the data except as an employee or contract consultant of AMS. It is beyond genuine material dispute on the Rule 56 record that, regardless of the temporary restraining order and AMS's copying of the installed version of TimeTracker, Ruff at all times had a complete copy of the installed version of TimeTracker as well as exclusive possession and control over the uncompiled source code for the TimeTracker functional component. Nothing in the licensing agreement expressly or implicitly required AMS to provide infrastructure or support to assist Ruff in soliciting AMS clients or providing TimeTracker to new clients.
¶53 Moreover, nothing in the language of the licensing agreement precluded AMS from employing a third-party computer consultant to assist in the administration of AMS's licensed use of TimeTracker. Ruff made no factual showing that the third-party consultant retained by AMS to copy the installed version of TimeTracker was involved in any capacity, or to any extent, other than as a limited contract agent of AMS for that purpose. Regardless of Ruff's retained contract interest in TimeTracker, Ruff made no non-speculative factual showing that the consultant did anything other than assist AMS in its licensed use of TimeTracker. Under these circumstances, Ruff's asserted factual showings and speculative arguments regarding AMS's alleged ***163 unscrupulous, post-dispute conduct were insufficient to raise a genuine issue of material fact regarding the parties' relative rights and obligations under the clear and unequivocal terms of the licensing agreement. We hold that the District Court correctly granted summary judgment on Ruff's counterclaim for breach of the 2008 licensing agreement.
b. Ruff's Conversion, Intellectual Property, and Trade Secret Counterclaims
¶54 Brief examination of the essential elements of the Ruff counterclaims for conversion, misappropriation of intellectual property, and MUTSA violation similarly manifest their common insufficiency on the Rule 56 record. The essential elements of common law conversion are: (1) a claimant's right of possession or control over the subject personal property; (2) the intentional exercise of possession or control over the property by another inconsistent with the right of the owner and without right or consent; and (3) resulting damages to the claimant. Gebhardt v. D.A. Davidson & Co. , 203 Mont. 384, 389, 661 P.2d 855, 858 (1983).
¶55 Apart from conversion, the common law further recognizes two related but distinct theories of misappropriation of intellectual property-contract-based misappropriation and property right-based tortious misappropriation. See Apfel v. Prudential-Bache Securities Inc. , 81 N.Y.2d 470, 600 N.Y.S.2d 433, 616 N.E.2d 1095, 1097-98 (N.Y. 1993) (distinguishing breach of non-disclosure agreement, contract misappropriation of intellectual property, and tortious misappropriation of property right-based intellectual property). Accord Nadel v. Play-by-Play Toys & Novelties, Inc. , 208 F.3d 368, 374-78 (2nd Cir. 2000) (construing Apfel ).[15]
¶56 As a specialized variant of a breach of contract theory, the elements of a claim for contract misappropriation of intellectual property are:
*592 (1) an agreement for one to communicate an idea or knowledge to another in return for valuable consideration;
(2) the idea or knowledge had value to the recipient at the time of contract formation regardless of whether "grossly unequal" or of "dubious value" in relation to the consideration paid or provided ***164 in return;[16]
(3) the recipient breached the agreement; and
(4) resulting damages to the claimant based on breaching party's beneficial use of the idea or knowledge.
See Apfel , 600 N.Y.S.2d 433, 616 N.E.2d at 1097-98 (emphasizing freedom of contract and subjective assessment of value). Accord Nadel , 208 F.3d at 376-80. While a truly novel idea or knowledge is presumed to be of value to a recipient who paid or pledged valuable consideration to acquire it, an idea or knowledge need not be truly original or novel to be of value to a recipient as a matter of contract consideration. Apfel , 600 N.Y.S.2d 433, 616 N.E.2d at 1098 (noting that a buyer may nonetheless "reap benefits from such a contract in a number of ways," such as "by not having to expend resources pursuing the idea through other channels or by having a profit-making idea implemented sooner rather than later"). Accord Nadel , 208 F.3d at 374-80 (distinguishing relaxed novelty standard for contract claims from more stringent absolute novelty standard for tort claims).See also §§ 26-1-602(38) and 28-2-804, MCA (written contract presumed to be supported by "good and sufficient consideration"). Nonetheless, an idea or knowledge that is obvious, previously or generally known, or merely derivative or a variant thereof is presumed to have no value to the recipient as contract consideration. Nadel , 208 F.3d at 378-80 (obvious or generally known idea is imputed to the recipient as a matter of law thus rendering it valueless as contract consideration). Accord Soule v. Bon Ami Co. , 201 A.D. 794, 195 N.Y.S. 574, 575-76 (N.Y. App. Div. 1922) (idea to increase manufacturer profits by increasing wholesale price to retailers without increase in retail price merely a variant or derivative of an obvious or commonly known concept).
¶57 The essential elements of a property rights-based claim for tortious misappropriation of intellectual property are:
(1) an idea was communicated by the claimant to another in confidence;
(2) the idea was novel and original;
(3) the recipient used the idea to the recipient's benefit; and
(4) resulting damages to the claimant based on the tortfeasor's beneficial use of the idea or knowledge.
***165 See Apfel , 600 N.Y.S.2d 433, 616 N.E.2d at 1097-98 ; Alevizos v. John D. & Catherine T. MacArthur Found. , 764 So.2d 8, 11 (Fla. App. 1999). An idea may give rise to a cognizable property right or interest only if novel and original. Apfel , 600 N.Y.S.2d 433, 616 N.E.2d at 1098 ; Paul v. Haley , 183 A.D.2d 44, 588 N.Y.S.2d 897, 902 (N.Y. App. Div. 1992) (idea that is not novel is not cognizable as property and thus cannot be misappropriated or stolen); Downey v. Gen. Foods Corp. , 31 N.Y.2d 56, 334 N.Y.S.2d 874, 286 N.E.2d 257, 259 (1972) (ideas are cognizable and protectable as property rights only if novel and original).
¶58 For purposes of tort liability, an idea or knowledge that is obvious, already known or possessed by the recipient, generally or commonly known or available, or merely a variant, derivative, or progression thereof is not novel or original. Alevizos , 764 So.2d at 11-12 ; Apfel , 600 N.Y.S.2d 433, 616 N.E.2d at 1098 ; Paul , 588 N.Y.S.2d at 903. Accord Downey , 334 N.Y.S.2d 874, 286 N.E.2d at 259-60 (idea to market an existing product under a name that was merely descriptive of an obvious characteristic of the product and a variant of a previously known concept).
Not every 'good idea' is a legally protectible [sic] idea. ... [A]n idea which is a variation on a basic theme will not support a finding of novelty. ... Even though an idea need not reflect 'the flash of genius' to warrant protection, it must show genuine *593 novelty and invention, and not merely a clever or useful adaptation of existing knowledge. ... Improvement of standard technique or quality, the judicious use of existing means, or the mixture of known ingredients in somewhat different proportions-all the variations on a basic theme-partake more of the nature of elaboration and renovation than of innovation.
Paul , 588 N.Y.S.2d at 903 (internal citations and punctuation omitted). Ideas which are not novel "are in the public domain and may freely be used by anyone with impunity." Ed Graham Prods. v. Nat'l Broad. Co. , 75 Misc.2d 334, 347 N.Y.S.2d 766, 769 (N.Y. Sup. Ct. 1973).
¶59 In contrast to the common law protection of intellectual property, MUTSA defines the term "trade secret" as any "information or computer software, including a formula, pattern, compilation, program, device, method, technique, or process, that:
(a) derives independent economic value ... from not being generally known ... [or] readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
(b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
Section 30-14-402(4), MCA. In pertinent part, MUTSA defines actionable "misappropriation" of a trade secret as the "disclosure or use ***166 of a trade secret of another without express or implied consent by a person who ... used improper means to acquire knowledge of the trade secret." Section 30-14-402(2)(b)(i), MCA. As used in § 30-14-402(2)(b)(i), MCA, and as pertinent here, "improper means" includes theft, misrepresentation, or breach of a duty to maintain secrecy.
¶60 The common essence of Ruff's theft-based counterclaims (conversion, misappropriation, and MUTSA violation) is the allegation that TimeTracker contained proprietary or trade secret information that AMS accessed and beneficially used to Ruff's detriment. However, as noted by the District Court, and manifest on the Rule 56 record, Ruff had no legal copyright, trademark, or patent protection for TimeTracker. Ruff's theft-based claims were grounded in the terms of the 2008 licensing agreement. However, as previously analyzed herein, AMS used and accessed the installed TimeTracker program in accordance with the terms of the licensing agreement. Moreover, Ruff made no responsive factual showing rebutting AMS's showings that AMS did not have access to the uncompiled source code for TimeTracker's functional component and that AMS lacked sufficient technical expertise to reverse-engineer it from the compiled machine code to which it did have access.
¶61 Further, Ruff admitted that AMS exclusively owned the customer data that it copied from TimeTracker's SQL-based database for conversion into SlatePay's NoSQL database.[17] While AMS had access to the uncompiled SQL source code constituting the TimeTracker database component, Ruff made no factual showing rebutting AMS's expert showing that TimeTracker's "stored procedures and triggers" (i.e. TimeTracker's SQL-based programming interface) were fundamentally incompatible and unusable by design and nature with SlatePay's NoSQL-based database structure.[18]
***167 ¶62 Even to the extent that AMS may or could have nonetheless modeled or adapted certain SlatePay features, functions, or processes on certain logical structures, functions, or processes evident from the SQL-based TimeTracker database component, *594 Daniel testified that TimeTracker's uncompiled SQL-based "stored procedures and triggers" were unencrypted and "open."[19] Ruff made no evidentiary showing that Daniel made any effort to maintain the asserted confidentiality or secrecy of TimeTracker's SQL-based "stored procedures and triggers." In contrast, AMS made an unrebutted expert showing that TimeTracker's functionality and processes were "very understandable" and characteristic of "well documented process flows" provided "by literally hundreds of vendors out there." Lastly, in contrast to the express specification in the 2008 licensing agreement that Ruff would designate any asserted proprietary information in the software, TimeTracker did not include any such proprietary notice or designation.
¶63 In the face of these facts and beyond cursory characterization as trade secret or proprietary information, Ruff has failed to make any particularized showing as to how or on what basis TimeTracker's "stored procedures and triggers," design, functionality, or features are novel, unique, or substantially different from those available in, or derived or adapted from, other commonly available payroll time tracking software. Ruff has further failed to make any affirmative factual showing that AMS's conduct and use of TimeTracker caused damages or detriment to Ruff. Under these circumstances, Ruff's conversion claim fails as a matter of law due to lack of proof of wrongful dominion or use and lack of damages. Ruff's contract misappropriation fails due to lack of proof of breach of the 2008 licensing agreement and lack of damages. Ruff's tortious misappropriation claim fails due to lack of proof of novelty, originality, and damages. Ruff's MUTSA claim fails due to lack of proof of improper acquisition, independent economic value based on knowledge not generally known or readily ascertainable, and damages. We hold that the District Court correctly granted AMS summary judgment on Ruff's counterclaims for conversion, contract and tortious misappropriation of intellectual property, and MUTSA violation.
c. Ruff's Unjust Enrichment Counterclaim ***168 ¶64 Unjust enrichment is an equitable claim for restitution to prevent or remedy inequitable gain by another. N. Cheyenne Tribe v. Roman Catholic Church ex rel. Great Falls/Billings Dioceses , 2013 MT 24, ¶¶ 36-39, 368 Mont. 330, 296 P.3d 450 ; Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011) ("person who is unjustly enriched" is liable "in restitution").[20] Forms of restitution available upon proof of an unjust enrichment claim include direct restoration of the benefit conferred or gained, or imposition of a constructive trust to the same effect. Volk v. Goeser , 2016 MT 61, ¶ 45, 382 Mont. 382, 367 P.3d 378 (noting broad discretion of court "to impose" or "declare" a constructive trust upon proof of elements of unjust enrichment); N. Cheyenne Tribe , ¶¶ 38-39 ("unjust enrichment serves as a unifying principle for a wide variety of equitable claims" which the court may vindicate by restitution including imposition of a constructive trust); Restatement (Third) of Restitution § 1 cmts. c and e (distinguishing between restitution as a remedy and restitution as a theory of liability).[21] In any form, *595 the measure of restitution is the amount of the defendant's inequitable gain. N. Cheyenne Tribe , ¶ 38.[22] ***169 ¶65 The essential elements of an unjust enrichment claim are: (1) a benefit conferred on one party by another; (2) the other's appreciation or knowledge of the benefit; and (3) the other's acceptance or retention of the benefit under circumstances that would render it inequitable for the other to retain the benefit without compensating the first party for the value of the benefit. N. Che yenne Tribe , ¶¶ 33 and 36. 23 While restitution remains an available remedy to prevent a party from unjustly benefitting from "fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act," see In re Estate of McDermott , 2002 MT 164, ¶ 26, 310 Mont. 435, 51 P.3d 486 (discussing constructive trusts), unjust enrichment does not necessarily require proof of a wrongful act or conduct. Vol k , ¶¶ 45 and 50 (affi rming imposition of constructive trust where defendant "has done nothing wrong"); N. Che yenne Tribe , ¶¶ 29-35 and 38-39 (disc ussing constructive trusts); Restatement (Third) of Restitution § 1 cmt. f. Unjust enrichment merely requires proof that a party unjustly gained something of value, regardless of wrongful conduct. N. Che yenne Tribe , ¶ 38; Rest at ement (Third) of Restitution § 1 cmt. a.
¶66 Here, citing Estate of Pruyn , ¶ 64 (unjust enrichment requires proof of "misconduct or fault on the part of the defendant or that the defendant somehow took advantage of the plaintiff"), the District Court granted summary judgment to AMS on Ruff's unjust enrichment claim on the grounds that "unjust enrichment is a remedy for those parties who do not have a valid contract and cannot seek compensation for an alleged breach" and that this dispute arose in the context of a valid contract that AMS did not breach. However, the court's analysis overlooked our subsequent holding that unjust enrichment no longer requires proof of a wrongful act or conduct. N. Cheyenne Tribe , ¶¶ 30-35 and 39 (noting statutory abandonment of former requirement for proof of a wrongful act or conduct as a prerequisite for a constructive trust). Accord Volk , ¶¶ 45 and 50 (affirming imposition of constructive trust where defendant "has done nothing wrong");
***170 Restatement (Third) of Restitution § 1 cmt. f.[24] Thus, the District Court erroneously granted summary judgment to AMS on Ruff's unjust enrichment claim on the ground AMS did not commit a wrongful act.
¶67 Nonetheless, "[a] valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment." Restatement (Third) of Restitution § 2(2). Accord Welu v. Twin Hearts Smiling Horses, Inc. , 2016 MT 347, ¶ 36, 386 Mont. 98, 386 P.3d 937 (unjust enrichment inapplicable where matter at issue governed by an enforceable contract); Pruyn , ¶ 63 (unjust enrichment "is an obligation created by law in the absence of an agreement between the parties"). Consequently, unjust enrichment applies in the contract context only when a party renders "a valuable performance" or confers a benefit upon another under a contract that is invalid, voidable, "or otherwise ineffective to regulate the parties' obligations."
*596 Restatement (Third) of Restitution § 2(2) cmt. c. See also Robertus v. Candee , 205 Mont. 403, 407, 670 P.2d 540, 541-42 (1983) (unjust enrichment available in contract context to non-breaching parties precluded from seeking contract damages because statute of frauds rendered otherwise governing contract unenforceable); Restatement (Third) of Restitution §§ 31 and 36 (availability of unjust enrichment where governing contract is indefinite, unenforceable, or does not address aftermath of a material breach); Restatement (Second) of Contracts §§ 283 cmt. c and 373-77 (1981) (addressing various contract-related scenarios where an otherwise governing contract is rescinded, unenforceable, or ineffective to address consequences of a material breach).
¶68 Here, as correctly concluded by the District Court, the 2008 licensing agreement was a valid and enforceable contract comprehensively governing the parties' respective rights and obligations regarding TimeTracker. As further correctly concluded by the court on the record presented, AMS was not in breach of the agreement and acted lawfully within its contract rights. Ruff made no affirmative material showing to the contrary. AMS was thus entitled to judgment as a matter of law that it was not unjustly enriched under the facts and circumstances in this case. We hold that the District Court correctly granted AMS summary judgment on Ruff's unjust enrichment claim.
d. Ruff's Counterclaim for Tortious Interference with ***171 Business Relations/Prospective Economic Advantage
¶69 The essential elements of tortious of interference with business relations or prospective economic advantage are: (1) an intentional act or conduct by the alleged tortfeasor; (2) performed by the tortfeasor "without right or justifiable cause"; (3) performed for the purpose of causing damage or loss to another; and (4) resulting damages. Maloney v. Home & Inv. Ctr., Inc. , 2000 MT 34, ¶ 41, 298 Mont. 213, 994 P.2d 1124 (distinguishing tortious interference with contractual relations). Here, as correctly concluded by the District Court, AMS acted lawfully within its contract rights regarding TimeTracker and did not impede or interfere with Ruff's ability to independently market TimeTracker, either to existing AMS clients or to new clients. It is further beyond genuine material dispute on the Rule 56 record that, except for a brief period in accordance with a temporary restraining order, AMS did not deny Ruff access to the Ruff server and, in any event, had no obligation to allow Ruff to independently host TimeTracker to third parties from AMS's premises or via Internet service or infrastructure provided by AMS. Ruff further made no particularized, non-speculative showing of damages suffered as a result of AMS's alleged tortious conduct. We hold that the District Court correctly granted AMS summary judgment on Ruff's counterclaim for tortious interference with business relations or prospective economic advantage.
¶70 3. Did the District Court abuse its discretion in denying Ruff's second motion to compel discovery?
¶71 In response to AMS's certification of compliance with the District Court's June 1, 2016 discovery order, Ruff filed a second motion to compel additional production from AMS. In support of the motion, Ruff asserted that the "central issue at the heart of the litigation remains in dispute" due to AMS's failure to respond to previously propounded discovery requests, thereby preventing Ruff's retained computer expert from evaluating "whether and to what extent AMS leveraged TimeTracker in the creation of SlatePay." Ruff further characterized AMS's response to the June 1st order as a "2,000-page document dump" that did not include previously requested documents, including internal AMS communications related to TimeTracker and the development of SlatePay between April and June 2015. Ruff supplemented the motion based on the subsequent deposition testimony of AMS's lead software developer James Collins, who attested to his recollection of various, as yet unproduced, internal e-mail communications between Collins and other senior AMS personnel regarding AMS's intent and progress in the development of its SlatePay software after negotiations for the purchase of TimeTracker ***172 stalled. *597 ¶72 Except as otherwise limited by court order pursuant to M. R. Civ. P. 26(b)(2) and (c), a party may request and obtain discovery of any non-privileged information that is relevant to any claim or defense at issue, or reasonably likely to lead to the discovery of relevant information. M. R. Civ. P. 26(b)(1). In response to a formal request for production, the responding party must make reasonable inquiry and then either produce the information requested, state an objection including the particular reasons for the objection, or file a motion for a protective order. M. R. Civ. P. 26(g)(1) and 34(b)(2)(B) ; Richardson v. State , 2006 MT 43, ¶ 46, 331 Mont. 231, 130 P.3d 634 ; Patterson v. State, Dep't of Justice, Motor Vehicle Div. , 2002 MT 97, ¶ 15, 309 Mont. 381, 46 P.3d 642. If the responding party objects to a request for production on the ground of privilege, the objection must specifically identify the privilege asserted and describe the nature of the withheld information in a manner sufficient to enable the propounding party to assess the claim without disclosure of the privileged information. M. R. Civ. P. 26(b)(6)(A). Conclusory, pattern, or boilerplate objections that merely assert that a discovery request is privileged, overly broad, unduly burdensome, irrelevant, or not reasonably likely to lead to relevant information are insufficient and unresponsive. Redland Soccer Club, Inc. v. U.S. Dept. of the Army , 55 F.3d 827, 856 (3rd Cir. 1995) ; Josephs v. Harris Corp. , 677 F.2d 985, 991-92 (3rd Cir. 1982) ; Walker v. Lakewood Condo. Owners Ass'n , 186 F.R.D. 584, 586-87 (C.D. Cal. 1999) ; Obiajulu v. City of Rochester , 166 F.R.D. 293, 295 (W.D. N.Y. 1996) ; Compagnie Francaise d'Assurance v. Phillips Petroleum Co. , 105 F.R.D. 16, 42-43 (S.D. N.Y. 1984). The party resisting discovery must specifically state how each contested discovery request is overly broad, burdensome, or not relevant or reasonably likely to lead to discovery of relevant information. Redland Soccer Club , 55 F.3d at 856 ; Josephs , 677 F.2d at 991-92. If a request seeks production of information that is only partially objectionable, the responding party must produce all non-objectionable information requested. M. R. Civ. P. 34(b)(2)(C). A discovery request is presumed to be proper if the responding party fails to timely object or seek a protective order. Patterson , ¶ 15. Failure or refusal to fully and fairly answer proper discovery requests "essentially prevents the case from progressing" and warrants appropriate sanction as applicable under M. R. Civ. P. 26(g) and 37. Linn v. Whitaker , 2007 MT 46, ¶ 15, 336 Mont. 131, 152 P.3d 1282.
¶73 Contrary to AMS's certification and related assertions, Collins' eleventh-hour deposition testimony in fact demonstrated that AMS
***173 failed to produce, or adequately explain its failure to produce, a quantum of previously existing records of non-privileged internal AMS communications which, at least at the time of the original discovery requests, were potentially relevant to claims then at issue in this case. Equally disturbing, the record indicates that the District Court failed to demand a particularized showing as to why or on what basis AMS withheld records within the scope of Ruff's discovery requests as privileged or otherwise not calculated to lead to the discovery of relevant information.[25]
¶74 In the face of AMS's initial non-descriptive boilerplate responses, and subsequent written and in-court assertions that it had fully produced all discoverable information requested or compelled, Ruff ultimately made a particularized showing that AMS's prior discovery responses were incomplete. However, while we are reluctant to ignore AMS's manifestly non-responsive boilerplate discovery responses and the District Court's apparent acceptance of AMS's bald representations as to the content of disputed documents, the narrow issue on appeal is whether the District Court's rationale for denying Ruff's second motion to compel constituted an abuse of discretion.
*598 ¶75 Ruff filed its second motion to compel in response to AMS's potentially dispositive motion for summary judgment. The previously requested information regarding the design, data structures, and functionality of AMS's SlatePay program was again at issue, as well as suspected internal AMS e-mails and correspondence (involving AMS Executive Director Greg Roadifer, IT Supervisor Tracy Roadifer, software developer James Collins, and third-party AMS clients) regarding AMS's intent and progress in the development of SlatePay. Ruff and his retained expert continued to assert that this information was crucial to assess the manner and extent to which AMS used or "leveraged" TimeTracker to develop SlatePay. The District Court acknowledged that the outstanding discovery requests were not new, but determined the requests to be futile to Ruff's counterclaims in the face of the material facts then of record to which no genuine issue existed. We agree.
***174 ¶76 Contrary to its prior assertion, Ruff had previously acknowledged that it did not need access to SlatePay's source code to assess whether AMS had used TimeTracker to develop SlatePay. Ruff also does not dispute on appeal the District Court's observation that Ruff's requests for information regarding SlatePay's design, data structures, and functionality sought production of documentation that, though producible anew, AMS did not possess. Ruff likewise does not contest on appeal AMS's assertion that many of the requested documents either contained SlatePay source code or personal third-party information.
¶77 As described by Ruff, the unproduced internal AMS communications were largely, if not exclusively, preliminary 2015 communications regarding AMS's intent and efforts to develop SlatePay, including, inter alia , the transmittal to Collins of the Ruff-provided credentials for administrative access to the Ruff server and the installed version of TimeTracker. As a matter of law, the requested internal AMS communications could not have altered or affected the legal interpretation of the clear and unambiguous language of the 2008 licensing agreement. Based on its narrow focus on SlatePay and AMS's conduct rather than TimeTracker, the requested discovery could not in any event have given rise to a genuine issue of material fact regarding facts that were then of record, beyond genuine material dispute, regarding the evidentiary and legal insufficiency of TimeTracker and the 2008 licensing agreement as support for Ruff's counterclaims.
¶78 As correctly concluded by the District Court based on the facts then of record beyond genuine material dispute, AMS was acting within the scope of its contract rights when it accessed the Ruff server and copied TimeTracker for installation on AMS's server. It was further beyond genuine material dispute that TimeTracker's SQL-based database structure and "stored procedures and triggers" were open, unencrypted, and without proprietary designation as contemplated by the 2008 licensing agreement. Ruff's SlatePay-focused discovery requests could not in any event rebut AMS's factual showings that: (1) TimeTracker's SQL-based "stored procedures and triggers" were incompatible and unusable with SlatePay's NoSQL database and programming interface; (2) AMS owned the customer data in the TimeTracker database;[26] and (3) TimeTracker's "stored procedures and triggers" were not novel, original, or undiscoverable by AMS upon ***175 lawful use of TimeTracker under the 2008 licensing agreement. In contrast to Ruff's SlatePay-focused discovery requests, the facts and issues that were fatal to Ruff's claims had to do with what AMS was authorized to do under the 2008 licensing agreement and what TimeTracker was and was not on the then-existing Rule 56 record. Though we do not approve of AMS's discovery responses, the discovery requested under Ruff's second motion to compel was nonetheless futile on its face under the particular facts and circumstances then of record in this case.[27] We hold that the *599 District Court did not abuse its discretion in denying Ruff's second motion to compel.
¶79 4. Did the District Court abuse its discretion in denying Ruff's motion for attorney fees as the prevailing party on AMS's claims?
¶80 Ruff asserts that it is entitled to attorney fees under the attorney fees provision in the 2008 licensing agreement or, alternatively, pursuant to § 27-8-313, MCA. In pertinent part, the 2008 licensing agreement expressly provided:
In the event of a breach of this agreement, the party at fault shall and will pay to the other party all ... reasonable attorneys' fees ... which may be incurred by the said other party in enforcing such party's rights hereunder.
Narrowly focusing on AMS's breach of contract claim against Ruff, the District Court ruled that the contract attorney fees provision did not apply pursuant to its express terms because there was no adjudicated breach of the 2008 licensing agreement as alleged by AMS.
¶81 Contract attorney fees provisions are reciprocal to both parties regardless of express benefit only to one. Section 28-3-704(1), MCA. We construe the imprecise language at issue to provide that, in the event of an adjudicated breach of the agreement, the breaching party shall be liable to the non-breaching party for attorney fees incurred to enforce the contract rights of the non-breaching party. While it expressly applied only to the benefit of a party who prevailed on a claim that the other party breached the agreement, the contract provision at issue also reciprocally benefited a non-breaching party who prevailed against an adverse breach of contract claim. Section 28-3-704(1), MCA. AMS's declaratory judgment claims were contract-based and inextricably intertwined with Ruff's breach-based ***176 counterclaims. Without need to sort out the parties' breach-based claims, neither party was the prevailing party on their intertwined contract claims. Ruff prevailed on AMS's contract claims but AMS prevailed on Ruff's contract counterclaims. We hold that the District Court correctly denied Ruff's claim for contract attorney fees.
¶82 Ruff alternatively asserts that it is entitled to attorney fees pursuant to § 27-8-313, MCA. As a narrow statutory exception to the American Rule, district courts have discretion to grant supplemental relief, including attorney fees, "based on a declaratory judgment or decree ... whenever necessary or proper." Section 27-8-313, MCA ; Trustees of Indiana Univ. v. Buxbaum , 2003 MT 97, ¶ 46, 315 Mont. 210, 69 P.3d 663. However, a supplemental award of attorney fees is not necessary and proper in every case and certainly not automatic to a prevailing party. Mungas v. Great Falls Clinic, LLP , 2009 MT 426, ¶ 44, 354 Mont. 50, 221 P.3d 1230. A court may award attorney fees under § 27-8-313, MCA, only if (1) warranted by equitable considerations under the particular facts and circumstances of each case and (2) "necessary and proper" under § 27-8-313, MCA, as indicated by the three-part "tangible parameters test." Davis v. Jefferson Cnty. Elec. Office , 2018 MT 32, ¶ 13, 390 Mont. 280, 412 P.3d 1048 ; Mungas , ¶ 45 ; United Nat'l Ins. Co. v. St. Paul Fire & Marine Ins. Co. , 2009 MT 269, ¶ 38, 352 Mont. 105, 214 P.3d 1260.
¶83 Here, as noted by the District Court, Ruff prevailed on AMS's declaratory judgment claim, but the claim was not frivolous. As further noted by the court, Ruff made no non-speculative showing that AMS instituted this action in furtherance of an improper motive. In that regard, AMS's claims were no less meritorious than Ruff's counterclaims. Ruff has made no showing that equitable considerations warranted a supplemental award of attorney fees in order to afford meaningful relief under the totality of the circumstances in this case. We hold that the District Court did not abuse its discretion in denying Ruff's alternative claim for attorney fees under § 27-8-313, MCA.
CONCLUSION
¶84 We hold that the District Court correctly granted Ruff summary judgment that the 2008 licensing agreement was valid and enforceable in accordance with its express terms and that AMS had no right to TimeTracker other than as provided under the terms of the agreement. We hold further that *600 the District Court correctly granted summary judgment on the Ruff counterclaims for breach of the 2008 licensing agreement, tortious conversion, contract and tortious ***177 misappropriation of intellectual property, MUTSA violation, tortious interference with business relations or prospective economic advantage, and unjust enrichment. We hold finally that the District Court did not abuse its discretion in denying Ruff's second motion to compel or claim for attorney fees.
¶85 Affirmed.
We concur:
MIKE McGRATH, C.J.
JAMES JEREMIAH SHEA, J.
BETH BAKER, J.
JIM RICE, J.

Title 30, chapter 14, part 4, MCA.

AMS further asserts that it is entitled to attorney fees as the prevailing party to that extent.

Over the course of her AMS tenure, Diane Ruff variously served as the executive director, president, and a board member of AMS.

The District Court subsequently construed the essence of this language to mean that the TimeTracker software and related materials were "proprietary and confidential" only to the extent so designated by "a proprietary notice in human- or machine-readable form."

A computer programming language is a standard set of coded alpha-numeric syntax and commands used to control or instruct basic computer functions necessary to produce computational and algorithmic data processing, output, and control of other hardware devices.

AMS lead software designer (James Collins) testified that SlatePay functioned in a manner similar to TimeTracker but with certain additional functions and features that worked in conjunction with other AMS programs.

As admitted by AMS, and repeatedly cited by Ruff as evidence or indicia that AMS unlawfully used or "leveraged" TimeTracker to develop SlatePay, Collins used an "SQL adapter" program to convert the SQL-formatted AMS customer data in the TimeTracker database into a NoSQL format for input into SlatePay's NoSQL database.

On November 3, 2015, the District Court granted Ruff's motion to disqualify the law firm of Christensen, Fulton & Filz, PLLC, as AMS's litigation counsel due to the involvement of lawyer Tim Filz as AMS's former counsel and a material witness in this matter.

The Court also enjoined AMS from further development or use of SlatePay pending hearing.

In parallel, the AMS employee handbook generally prohibited employees from engaging in activities or using company facilities, equipment, or computing resources for personal convenience or profit.

Inter alia , AMS relies on its affidavit showings that: (1) Daniel instructed his development assistant (Joe Krueger) to avoid reference to Ruff Software and refer to TimeTracker as "Powered by AMS"; (2) the TimeTracker manual drafted by Daniel made no reference to Ruff Software; and (3) Daniel referred to TimeTracker in an employment-related e-mail to AMS clients as "our online website TimeTracker" on "our own website" and "webserver ... in our office." Without more, those facts are insufficient to raise a genuine issue of material fact as to the meaning of the clear and unambiguous terms of the written licensing agreement or whether Diane Ruff was acting outside the scope of her actual or ostensible authority when she executed the licensing agreement.

While § 35-1-462, MCA, does not preclude derivative attack on corporate actions on other statutory or common law grounds, (see Commission Comments to § 35-1-461, MCA ) and Warren , ¶¶ 26-36, AMS squarely challenges the 2008 licensing agreement as a director conflict of interest transaction, as defined by § 35-1-461, MCA, within the scope of § 35-1-462, MCA, as referenced in § 35-1-463, MCA.

Moreover, in the face of Ruff's affirmative showing that the 2008 licensing agreement was sufficiently supported by reciprocal consideration and otherwise ratified by the AMS board after April 2013, the mere facts of the familial relationship between Diane and Daniel and the 90% royalty right would be insufficient on the Rule 56 record presented to raise a genuine issue of material fact as to whether the agreement was objectively unfair to AMS under the totality of the circumstances.

Consistent with this interpretation, Daniel advised AMS in his April 23, 2015 e-mail that Ruff "will no longer offer consulting services for the AMS payroll system effective June 1st, 2015."

See also Paul v. Haley , 183 A.D.2d 44, 588 N.Y.S.2d 897, 902-04 (N.Y. App. Div. 1992) (distinguishing common law-protected ideas from federal law-copyrightable expressions of ideas ).

Referenced here for clarity as a separate element of the contract claim, this element is essentially no more than a subject matter-specific consideration of the threshold sufficiency of the idea or knowledge as contract consideration. See Apfel , 600 N.Y.S.2d 433, 616 N.E.2d at 1097-98 ; Nadel , 208 F.3d at 374-80.

Ruff made much ado about the fact that AMS's access to the TimeTracker database component also allowed AMS to access and use the fictitious "AE Widgets" data set created by Ruff for use in the initial development and testing of TimeTracker. However, Ruff made no showing, or even assertion, that the fictitious data set was itself confidential information.

AMS made an unrebutted expert showing that, though access to TimeTracker's uncompiled SQL-based "stored procedures and triggers" would have allowed AMS to copy or modify the TimeTracker database component, or to develop an SQL-based variant, any such copy, modification, or variant of the TimeTracker database structure or "stored procedures and triggers" would have been incompatible and unusable with SlatePay's NoSQL based database structure and programming interface.

In the field of computer software, "open" or "open source" is a term describing software that is unencrypted and available for unlicensed use, modification, or variation by others.

"The law of restitution is predominantly the law of unjust enrichment" and is "concerned with identifying those forms of enrichment that the law treats as 'unjust' for purposes of imposing liability." Restatement (Third) of Restitution § 1 cmt. b. Unjust enrichment "is enrichment that lacks an adequate legal basis; it results from a transaction that the law treats as ineffective to work a conclusive alteration in ownership rights." Restatement (Third) of Restitution § 1 cmt. b. Unjust enrichment applies to "nonconsensual and non-bargained benefits in the same way" that tort liability applies to "nonconsensual and non-licensed harms." Restatement (Third) of Restitution § 1 cmt. d.

A constructive trust is an equitable remedy applicable when "a person holding title to property is subject to an equitable duty to convey it to another on the ground that the person holding title would be unjustly enriched if he were permitted to retain it." Section 72-33-123, MCA. Thus, rather than a predicate claim for relief, a constructive trust is generally an equitable remedy available upon proof of an unjust enrichment claim. See § 72-33-123, MCA. Accord , Restatement (Third) of Restitution § 3 cmt. a (discussing equitable disgorgement of resulting profits as another remedy for an unjust enrichment claim involving "conscious wrongdoing").

See also Volk , ¶ 53 ("court sitting in equity is empowered to determine all questions involved in the case, and to fashion an equitable result that will accomplish complete justice. ... [T]he measure of relief must be shaped by the circumstances of the affected parties and the equity of the transaction ... [C]ourt may ... consider any other factors it deems pertinent to its obligation to work an equitable result"). See also N. Cheyenne Tribe , ¶¶ 30-32 (noting codification of equity).

To the extent that Pruyn and its cited underpinnings hold that unjust enrichment necessarily requires proof of a wrongful act or conduct, these cases are hereby overruled.

In the District Court's October 24, 2016 order denying Ruff's second motion to compel, the court noted that AMS's "counsel, as an officer of the Court, informed the Court [that] the emails in question are not emails that have any factual information or statement about TimeTracker versus SlatePay or development of SlatePay. Instead, the emails contained mostly, if not all, source code which had been precluded by the Court from disclosure (and which Defendants agreed they did not need), or customer information (confidential user data) to be input into either program."

This admitted fact rendered immaterial the fact that AMS used an "SQL adapter" to convert TimeTracker's SQL-formatted data to the NoSQL format used by SlatePay.

As further noted by District Court, Ruff failed to show good cause for untimely seeking leave to amend to add additional counterclaims (abuse of process and bad faith), and for related supplemental discovery, based on facts and circumstances known or alleged by Ruff from the outset of this litigation.